UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No.   2:16 CR 150 JVB |
| | ) | |
| MARLONN HICKS | ) | |
| | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorney, Thomas L. Kirsch II, United States Attorney for the Northern District of Indiana, through Assistant United States Attorney Joshua P. Kolar, respectfully submits this sentencing memorandum in advance of Defendant Marlon Hicks's sentencing hearing, which is scheduled for March 30, 2018. Hicks pled guilty to distributing information on the manufacture or use of an explosive or destructive device with the intent that it be used for, or in furtherance of, a federal crime of violence.  While that crime is serious in and of itself, Hicks's actions rise to a different level when placed in context.  As detailed in this memorandum, Hicks transformed from a vocal supporter of ISIS[1] to someone planning a terrorist act.   He then continued to use ISIS-inspired rhetoric after his arrest.

---

[1] The Islamic State of Iraq and Syria ("ISIS"), including various iterations of its name, was designated a Foreign Terrorist Organization under Section 219 of the Immigration and

In short, Hicks is not before the Court merely because he engaged in distasteful commentary supportive of ISIS ideology. His sentencing is for sharing information on explosives while discussing a terror attack. For the reasons explained below, a sentence of 240 months reflects the serious nature of Hicks's crime.

## I.     INTRODUCTION AND PROCEDURAL HISTORY

On June 12, 2016, a gunman killed 49 people and wounded over 50 others in the Orlando, Florida Pulse nightclub, resulting in one of the deadliest mass shooting attacks in United States history.   News coverage recounted the horrifying scene of a man swearing allegiance to the head of ISIS and gunning down innocent civilians.[2]

While a stunned nation grieved and vigils were held throughout the country, Marlonn Hicks was inspired.  He was not inspired to help friends and family of the fallen.  He was not inspired to take a stand against violence. He was inspired to commit an act of terrorism and attack innocent civilians.  Hicks had previously expressed support for ISIS via the Internet and social media

---

Nationality Act, and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.

[2] *See,* http://abcnews.go.com/US/alive-raise-hand-desperate-rescuer-pulse-nightclub/story?id=46797935 and http://abcnews.go.com/US/omar-mateen-suspected-orlando-night-club-shooter/story?id=39790797, both accessed March 5, 2018.

but the attacks in Orlando and similar events transformed him from an online advocate of terrorism to someone who distributed information about explosives and poisons for purposes of planning an attack. Five days after the Pulse attack, Hicks proclaimed that given recent events, he wanted to "die here" and "do something major major without being caught." *See,* Presentence Investigation Report ("PSIR") at ¶12; Plea Agreement, Exhibit A.

Hicks's online communications drew the swift attention of the Federal Bureau of Investigation. Fortunately, the FBI identified and monitored Hicks early in his path to radicalization. As Hicks grew increasingly radicalized, the FBI conducted surveillance and ultimately took action to mitigate the threat he posed and to ensure public safety.

## A.    Hicks's support for ISIS grows.

Like many ISIS supporters, Hicks took his first steps towards radicalization when he reposted online extremist ideology supporting terrorism and martyrdom. In 2015, Hicks's social media posts included statements from ISIS, a picture of the ISIS flag waving behind a quote celebrating ISIS's defeat of the Iraqi Army in Ramadi, and a well-known terrorist firing an AK-47 with the words "Running Away from JIHAD will not Save You from Death, You can Die as a Coward OR You can Die as a Martyr." *See,* Sealed Exhibit A at Pgs. 1-3. Hicks also showed an interest in violence

3

and weapons.  Records from 2015 show that Hicks accessed websites discussing how to make gunpowder and stressing the importance of "Pre-Combat Staging" in "extreme close combat shooting."  *Id.* at Pgs. 4-5.

In 2016, Hicks's social media and online interactions with cooperating witnesses revealed a steadily increasing embrace of radical jihadist ideology. Hicks's 2016 postings included pictures of an armed ISIS fighter flying the ISIS flag on a decapitated Statue of Liberty, a group of armed ISIS fighters in front of the ISIS flag, ISIS leader Abu Bakr al-Baghdadi, and a picture of Osama bin Laden with a quote from Anwar Al-Alaki, a radical cleric who was born in the United States, rose to prominence posting English-language extremist propaganda, and was named leader of al-Qaeda in the Arabian Peninsula before he was killed in a drone strike.[3] *Id.* at Pgs. 6-9.

In April of 2016, Hicks discussed traveling to join ISIS.  Specifically, he mentioned traveling to Mosul, Iraq, explaining that he "used to think it was hard to get to Khalifah land," meaning ISIS-controlled areas, but came to

---

[3]    http://abcnews.go.com/Politics/eric-holder-americans-killed-drones/story?id=19236300, accessed March 2, 2018.

4

believe it was not difficult after all.   PSIR at ¶10.   At the time Hicks was discussing travel to Mosul, the city was primarily under ISIS control.[4]

Those, like Hicks, who support ISIS, attach special meaning to terms such as "Khalifah land" and use of other ISIS terms and symbols.   At sentencing, Professor Lorenzo Vidino, an expert in extremist ideology, radicalization, and counter-radicalization will detail the history of ISIS. He will review Hicks's social media posts and communications to explain the trajectory of Hicks's radicalization and acceptance of ISIS's violent and abhorrent teachings.   He will describe how ISIS routinely uses the internet to attract followers like Hicks.   Professor Vidino will explain that when ISIS followers use the term "Khalifah land", they draw upon the June 29, 2014 ISIS declaration of a worldwide Caliphate with Abu Bakr al-Baghdadi as its Caliph, or leader.   Professor Vidino will use the statements of ISIS spokesmen and a historical survey of its rise and teachings to place Hicks's actions in context. He will recount how in declaring a Caliphate, ISIS proclaimed that it was the leader of all "true" Muslims and all were required, if able, to "fight" for ISIS. He will show how many of Hicks's statements mirror ISIS propaganda and the instructions ISIS provided to its followers.

---

[4]     https://www.theguardian.com/world/2016/nov/04/battle-for-mosul-maps-visual-guide-fighting-iraq-isis, accessed March 2, 2018.

As Professor Vidino will summarize, ISIS's stated goals are to create and rule a Caliphate, and to fight against any nations that oppose it. ISIS atrocities include murdering people based upon sexual orientation and religion. Initially, ISIS encouraged supporters from throughout the world, including the United States, to travel to Iraq and Syria to join and fight for the terrorist organization. Over time, law enforcement and intelligence agencies began to arrest ISIS supporters and prevent them from travelling to ISIS-controlled territory. Additionally, the militaries of many coalition nations began killing ISIS fighters throughout Iraq and Syria. In September of 2014, Abu Muhammad al-Adnani ("Adnani")—who, prior to his death, served as an architect of ISIS's external operations and as ISIS's chief spokesman—issued a recorded statement calling for attacks against citizens, civilian or military, of the countries participating in the United States-led coalition against ISIS. Adnani encouraged followers to plan attacks in their home countries, or "from your place where ever you may be." In October of 2015, al-Adnani followed his earlier declaration with an approximately 40-minute audio message urging attacks around the world aimed at killing Americans and Russians.

At sentencing, the government will introduce Hicks's post-arrest statement[5], where he admitted that at one point he "wanted to go to the Islamic State", a reference to travelling to ISIS-controlled territory so that he could support the terrorist organization. Ultimately, however, Hicks indicated that he did not travel to ISIS-controlled areas because he faced hurdles, such as obtaining a passport, raising funds, and finding a safe route.

**B.     Hicks plans attacks in the United States.**

On June 21, 2016—nine days after the Pulse massacre—Hicks discussed "getting busy" with a FBI source posing as a like-minded ISIS follower. Hicks sent this FBI source two manuals containing detailed information on how to manufacture and use explosives and poisons. *See,* PSIR at ¶13; Sealed Exhibit B. Hicks received the documents from an ISIS follower located abroad. Hicks stressed to the source that the documents should only go to those deemed trustworthy and repeated that it was time to "get busy"[6] while lamenting that he was unable to "go and join [his] brothers," referring to his inability to travel

_____

[5] The government will introduce a recording of Hicks's post-arrest interview at sentencing. The recording was provided to defense counsel and the government intends to play key portions of the recording and/or enter portions of a transcript of the recording into evidence should it become relevant, or contested.

[6] The communication had a typo and said time to get "bust". Hicks confirmed he meant "busy" in his post-arrest statement.

to ISIS-controlled areas. *See,* Sealed Exhibit B at Pg. 5. He made his motivation for the planned attacks clear, exclaiming that since FBI and similar government personnel "have shut the door now I'm gonna open the door to hell for them." *Id.*

Hicks also began to develop an attack plan. He told the source to whom he sent the explosives and poisons manuals that while they could "always do joint ops," "each of us individually" would create "more of an audience." *Id.* at Pg. 8. In a separate communication to another source, Hicks remarked that it was easy to shoot someone from afar, but "the only thing is letting them know that the state [ISIS] is responsible." PSIR at ¶17. As he made clear in both his communications with multiple sources and post-arrest interview, Hicks wanted everyone to know the attacks were carried out in the name of ISIS. While he was planning attacks, he mentioned the need for a sniper rifle and discussed how to obtain such firearms and practice with them. Sealed Exhibit B at Pg. 14-16; PSIR at 16. In a yet another communication, he stressed that he was not "trying to clean only a couple kuffar," a term ISIS uses to refer to those who do not believe in their interpretation of Islam, but rather wanted to "do something major major without being caught." *See,* PSIR at ¶12.

The FBI initiated constant surveillance on Hicks and learned that he had firearms. In light of Hicks's dissemination of the manuals, the FBI

understood he could attempt to commit the attacks he was discussing, or some similar mass casualty attack.

As the FBI was conducting surveillance, Hicks warned one of the FBI sources to "be careful the boys was just following me." Sealed Exhibit B at Pg. 24. When this source questioned whether Hicks was sure that law enforcement was following him, Hicks described the cars he saw, which did in fact match the description of vehicles the FBI used. Hicks exchanged several more messages, including those saying he was "strapped", showing a picture of his firearm, and saying "if they had me on anything I'd already be dead cause in Shaa Allah [translated as god willing] I ain't going to jail." PSIR at ¶19. He felt he needed an additional firearm and said he was "finna go gun crazy". *Id.* Weeks later, the FBI entered Hicks's residence in the early morning hours and arrested him in his bedroom.

## C. Hicks is charged and pleads guilty.

On July 11, 2016, Hicks was charged in a one-count Criminal Complaint with violating Title 18, United States Code, Section 842(p)(2) ("§ 842(p)"), for distributing information on the manufacture or use of an explosive or destructive device with the intent that it be used for, or in furtherance of, a federal crime of violence. The federal crime of violence set forth in the Criminal Complaint was Title 18, United States Code, Section 2332a ("§ 2332a"), which

prohibits using, threatening, or attempting to use a weapon of mass destruction against "any person or property within the United States" when a "facility of interstate or foreign commerce" is used in furtherance of the offense or the offense or attempted offense would otherwise affect interstate commerce. The term "weapon of mass destruction" is defined to include "any destructive device," which in turn is defined in Title 18, United States Code, Section 921(a)(4) as "any explosive, incendiary or poison gas."

On October 28, 2016, Hicks pled guilty to a one-count Information charging him with § 842(p).   Docket Entry 5.   The Information included the same § 2332a predicate offense as the Criminal Complaint. Docket Entry 8. Hicks's Plea Agreement contained an agreed factual basis, in which he acknowledged his support for ISIS and admitted that when he said he would likely die "here" after "recent events" he was referring to his willingness to carry out a mass casualty attack similar to the attack on the Pulse nightclub in Orlando, Florida.  A PSIR was filed outlining the facts of the case, sentencing factors, and United States Sentencing Guidelines ("Guidelines") calculation.

### D.    Hicks's support for ISIS ideology and violence did not end with his charge, arrest or guilty plea.

Hicks's arrest did not temper his commitment to extremist ideology or willingness to engage in violence.  Recorded calls placed while Hicks was in custody reveal that in August of 2017, Hicks justified killing people based upon

their sexual orientation, mirroring yet another appalling ISIS edict.[7]  This was after he placed a separate call making threatening comments to his girlfriend, saying that if she went anywhere "somebody gonna wind up dead." In yet another call, he said that "if these people cause [him] to lose [his] wife[8]" he was going to "seek death."  Finally, in November of 2017, after pleading guilty, Hicks said that if he was facing the death penalty, he would simply "cuss the Judge out" and tell the Judge that he was going to kill one of the Judge's family members.[9]  These are not the words of a person who renounced violence and radical ideology.

---

[7]  *See, e.g.,* https://www.cbsnews.com/news/isis-orlando-shooting-gays-execution-torture-ramadan/, accessed March 5, 2018 (discussing ISIS justification for killing based on sexual orientation).

[8] Hicks was in a long term relationship and indicated that he had a religious wedding.  He was not legally married.

[9] This was said in the context of a long conversation where Hicks was expressing extreme displeasure with his situation and prospects.  It does not explicitly mention a particular Judge. Some of these calls likely violated Title 18, United States Code, Section 875(c), which prohibits threatening telephonic communications.  This could allow the government to object to a finding that Hicks has accepted responsibly and is entitled to a reduction under Guidelines § 3E1.1.  *See,* Plea Agreement at ¶7(b)(i)(stating the "government's obligation to recommend acceptance of responsibility under this plea agreement is contingent upon" certain facts and that the government has no such obligation if Hicks engages in "additional criminal conduct.").  However, the 3-level decrease in offense level for acceptance of responsibility under Guidelines § 3E1.1 will have no impact on Hicks's ultimate Guideline range since the Guidelines are capped at the statutory maximum for a violation of § 842(p). *See,* Guidelines, Chapter 5, Part A, Note 2 (setting forth that in those "rare cases" when the total offense level is more than 43, the total offense level is nonetheless treated as 43.).

## II. THE PRESENTENCE INVESTIGATION REPORT

The PSIR accurately calculates Hicks's Guideline range as the statutory maximum for a violation of § 842(p), 240 months of imprisonment.[10]  Given the seriousness of Hicks's crime, the Guidelines assign a high base offense level and then apply a significant enhancement, resulting in an adjusted offense level of 54. The PSIR correctly limits the final Guidelines calculation to the statutory maximum because Hicks's gross Guideline calculation falls above the top end of the Guidelines Sentencing Table. Hicks did not file any objections to the PSIR.  Hicks's Plea Agreement contained a factual basis that set forth the basis for the sentencing enhancement and further agreed that the sentencing enhancement should apply.  *See,* Plea Agreement at ¶7(b)(ii) and Exhibit A.

Hicks's base offense level is determined through Guideline § 2M6.1 (Unlawful Activity Involving Nuclear Material, Weapons, or Facilities, Biological Agents, Toxins, or Delivery Systems, Chemical Weapons, or Other Weapons of Mass Destruction; Attempt or Conspiracy).  Section 2M6.1 applies

---

[10] The Court need not resolve the government's objection to the PSIR because the objection does not impact Hicks's ultimate Guideline sentencing range. *United States v. Morrison*, 6 F. App'x 333, 334 (7th Cir. 2001), citing *United States v. McNeil,* 90 F.3d 298, 300 (8th Cir.1996) (noting that objections that have no impact on the Guideline range are moot). The PSIR calculated the base offense level through application of Guideline § 2M6.1.  The government's objection does not take issue with the fact that § 2M6.1 ultimately sets Hicks's base offense level. The objection is simply meant to state the government's position that § 2M6.1 applies only after a cross reference.

a base offense level of 42 when the offense is committed "with intent (A) to injure the United States; or (B) to aid a foreign nation or a foreign terrorist organization."  The PSIR correctly notes that both of these prongs apply to Hicks.  He intended to injure the United States by killing innocent victims, creating fear, and attempting to alter government policies by underscoring that his proposed attacks were to be done in retaliation for government actions. Hicks also clearly meant to aid a foreign terrorist organization given his repeated references of support for ISIS and statements that he wanted people to understand that the attacks he was planning were done in the name of ISIS.

Guideline § 3A1.4 (Terrorism) also applies since Hicks committed an offense "that involved, or was intended to promote, a federal crime of terrorism."  Section 3A1.4 requires proof of two elements: (1) the defendant must have been convicted of an offense that involved or was intended to promote a federal crime of terrorism; and (2) the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  Guidelines § 3A1.4, App. 4.A (stating that the "federal crime of terrorism" is defined by cross-reference to Title 18, United States Code, Section 2332b(g)(5)).

Hicks's offense meets the requirements for the application of § 3A1.4. Hicks's violation of § 842(p) involved distribution of information detailing the

manufacture and use of explosives and poisons.  Regarding the first prong, the attacks Hicks planned while distributing material that formed the basis of the § 842(p) charge would violate § 2332a, use or attempted use of a destructive device[11] against a person or property in the United States, effecting interstate commerce.  Section 2332a is an enumerated federal crime of terrorism under § 2332b(g)(5)).  Regarding the second prong, Hicks provided this information to an individual he thought was a like-minded ISIS supporter while he discussed committing coordinated attacks.  His stated purposes for the attacks, both in his communications to FBI sources and in his post-arrest interview, were to support ISIS and retaliate for the United States efforts to block travel to ISIS-controlled territory.  Moreover, one of the goals of ISIS is to alter United States policy and retaliate for the United States' intervention in conflict areas.

## III. SENTENCING ARGUMENT

When weighing the sentencing factors set forth in Title 18, United States Code, Section 3553(a) ("§ 3553(a)"), the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives—that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the

---

[11] The statutory term used is "weapon of mass destruction," which includes destructive devices.

law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. *See,* § 3553(a)(1) and (2). Many of the § 3553(a) factors are covered through the analysis of Guideline §§ 2M6.1 and 3A1.4. That is not surprising given the "nature of the Guidelines-writing task that Congress set for the Commission and the manner in which the Commission carried out that task. In instructing both the *sentencing judge* and the *Commission* what to do, Congress referred to the basic sentencing objectives that the statute sets forth in [§ 3553(a)]." *Rita v. United States*, 127 S.Ct. 2456, 2462, 2463 (2007).

Hicks is not facing sentencing for posting inflammatory content online. He is before the Court because he shared instructions on the manufacture and use of explosives and poisons intending that information for use in attacks here in the United States. His social media posts merely provide insights into his motivation for assisting in, and wanting to commit, senseless and potentially fatal attacks. Hicks is before the Court because he rapidly moved from discussions of ideology and praise for ISIS to attack planning.

Even in the absence of postings showing ISIS flags and disturbing quotes from terrorists around the world, Hicks's descriptions of proposed attacks in the United States leave little to the imagination. His own words show someone

15

seething with anger that the United States had helped block his ability to travel to join ISIS. *See, e.g.*, Sealed Exhibit B at Pg. 5 (Hicks says he will "open the door to hell" on the victims of his planned attack.)   In his post-arrest interview, he confirmed that this anger was directed in part at those who prevented him from traveling to join ISIS. His actions show he was looking for others to assist in conducting coordinated attacks and suggest he was following Adnani's edict to attack Americans.   In his post-arrest interview, Hicks acknowledged he was considering doing "operations or attacks here in the U.S." He admitted to thinking about this option after the attacks in Orlando and ISIS-inspired attacks in France and Belgium.[12]

Perhaps the most import factors for this Court to consider are protecting the public and affording adequate deterrence.   "Sentencing judges 'have discretion over how much weight to give a particular factor. Although the weighing must fall 'within the bounds of reason,' those bounds 'are wide.'" *United States v. Boroczk*, 705 F.3d 616, 624 (7th Cir. 2013); *United States v. Reibel,* 688 F.3d 868, 872 (7th Cir.2012).   In this case, Hicks's history of

---

[12]   *See,*   https://www.cbsnews.com/news/isis-major-blow-paris-attacks-suspect-salah-abdeslam-arrest-belgium-france/, accessed March 2, 2018 (discussing arrest of a suspect tied to the November 13, 2015 attack on a rock concert in Paris, France) and https://www.cnbc.com/2016/03/22/the-belgium-terror-attacks-complete-coverage.html (discussing attacks in Belgium), accessed March 2, 2018.

supporting ISIS, his planning of mass casualty attacks, and his failure to move away from radical thought even after his arrest show that the Guidelines sentence of 240 months is the only sentence that can adequately protect the public through deterring Hicks's criminal conduct and preventing acts of terrorism.

Congress ensured that the Guidelines take into account the special nature of terrorism offenses. Guideline § 3A4.1 was first implemented after Congress instructed the United States Sentencing Commission to "amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime." *See,* VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994, PL 103–322, September 13, 1994, 108 Stat 179. The enhancement under Guideline § 3A4.1 was broadened after Congress passed the USA PATRIOT Act in the aftermath of the September 11th attacks. See, e.g., Amendment 637, Guidelines Manual, App., Vol. II. ("This amendment is a six-part amendment that responds to the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act)").

The Courts have likewise consistently stressed the need to deter terrorists and aspiring terrorists with substantial periods of incarceration, placing emphasis on the likelihood such defendants will reoffend and noting the "grave threat" posed by such crimes. *See, e.g.*, *United States v. Jayyousi*, 657 F.3d 1085, 1114-15 (11th Cir. 2011) (stressing that "[t]errorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation" in upholding a defendant's sentencing for conspiracy and material support); *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.").

The Defendant remains a risk.  As his jail calls reveal, he continues to justify violence.  However, even if the chances of Hicks engaging in a future act of terrorism were low, the threat of harm remains.  "A low risk is not the same as no risk. Adequate protection is a function of two variables: the level of risk that conduct will occur and the level of harm that will be inflicted if that conduct does occur." *United States v. Irey*, 612 F.3d 1160, 1217 (11th Cir. 2010)

18

(en banc) (citing *United States v. Boyd*, 475 F.3d 875, 877-78 (7th Cir. 2007) (upholding a sentencing determination that the defendant's acts created a substantial risk of bodily injury to another person in part because "[d]angerousness is a function of the magnitude of the harm that will occur if danger materializes and the probability that it will materialize")).   In cases involving crimes of terrorism, the public is forced to accept very real risks of potentially devastating crimes upon a defendant's release.

Hicks will likely present arguments in mitigation.   While a letter from Hicks' family shows he has some redeeming qualities, *see,* Docket Entry 15, such mitigating factors should give way to concerns of recidivism and public safety. Moreover, mitigation is already taken into account by the interplay between the statute and Guidelines range.   Hicks's adjusted offense level of 54, *see,* PSIR at ¶ 31, combined with his criminal history category VI results in a Guideline range of life.   Hicks is already facing a significant "downward departure"[13] in his sentencing range due to the 240-month statutory maximum penalty for § 842(p).   The 240-month sentence is a 21-level decrease from

---

[13] While "downward variances" or departures are now obsolete, "District Courts can be guided by the departure provisions and apply them by way of analogy when assessing the § 3553(a) factors." *United States v. Maxfield*, 812 F.3d 1127, 1129–30 (7th Cir. 2016) (internal citations omitted).

Hicks's original offense level of 54. *See*, Guidelines Sentencing Table, Criminal History 33, Offense Level VI. Any further deviation is unwarranted.

In *United States v. Stewart*, the Second Circuit considered the sentence of Lynne Stewart for various crimes arising from her interactions with Sheikh Ahmad Ali Abdel Rahman. *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). Stewart, an attorney, helped Rahman communicate with his followers in Egypt. *Id.* at 114-16. Stewart did not plan or undertake any acts of violence. *Id.* at 116. Nevertheless, she was convicted of, *inter alia*, providing and concealing material support to a conspiracy to murder persons in a foreign country, in violation of 18 U.S.C. §§ 2339A and 956. The District Court originally sentenced Stewart to a 28–month term of incarceration, followed by a 2-year term of supervised release. *Id.* at 144. The Second Circuit remanded for resentencing, in part because the District Court procedurally erred in failing to decide whether Stewart committed perjury or otherwise obstructed justice. *Id.* at 149. On appeal, the Second Circuit characterized the sentence as an "extraordinary 92 percent reduction from the recommended Guidelines range" and the term of incarceration as "unprecedented in convictions for material support of terrorism." *Id.* at 165-66. Due in part to Stewart's comments pending resentencing, she was ultimately sentenced to 10 years despite arguments that her age (70 years old) and ill health made such a term

20

of imprisonment a life sentence. *United States v. Stewart*, 686 F.3d 156, 181 (2d Cir. 2012). There is no justification for a departure from a sentence designed to ensure public safety where Hicks, unlike Stewart, planned acts of violence and has demonstrated that he continues to adopt extremist ideology.

The Guidelines balance § 3553(a) factors and arrive at the common sense conclusion that even aspiring terrorists deserve a sentence well above the top of the Guideline Sentencing Table, absent the statutory maximum at issue in this matter. Guideline §§ 2M6.1 and 3A1.4 deal primarily with factors the Court should consider in aggravation, such as the nature and circumstances of the offense, the need to protect the public and provide adequate deterrence, and the seriousness of the offense. *See,* § 3553(a)(1) and (2)(A),(B), and (C). An independent review of the § 3553(a) factors "without any thumb on the scale favoring a Guideline sentence" likewise calls for a 240-month sentence. *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007). Hicks's conduct in 2015, 2016, and continuing with calls from jail in 2017, coupled with the tremendous risk of harm in terrorism cases, establishes that a 240-month sentence is the only sentence that is "sufficient but not greater than necessary" to provide deterrence and  protect the public. *See,* § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth [herein].").

## CONCLUSION

The government respectfully requests the Court to impose a custodial sentence of 240 months and 3 years of supervised release.  At sentencing, the government will introduce Hicks's post-arrest statement, recorded jail calls, the testimony of Professor Vidino, and other evidence to assist the Court in determining a just sentence.   Together with the contents of Hicks's social media and his discussions of attack planning, and for all of the reasons set forth above, this Guidelines sentence is the only sentence that fulfills the mandates of § 3553(a).  Like all sentencings, this will have unfortunate consequences for Hicks, his family members, and loved ones.  Nevertheless, the public should not bear the risk of even more monumental consequences should Hicks continue down the path he chose to travel.

Respectfully submitted,

Thomas L. Kirsch II
UNITED STATES ATTORNEY

BY:   /s/Joshua P. Kolar
Joshua P. Kolar
Assistant United States Attorney

22

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2018, I filed the above caption SENTENCING

MEMORANDUM through electronic process, with a service copy emailed to

the following:

Scott L. King

Respectfully submitted,

/s/Joshua P. Kolar

Joshua P. Kolar
Assistant United States Attorney