2018 WL 3490886
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

UNITED STATES of America, Plaintiff,

v.

2. Bakhtiyor JUMAEV, Defendant.

Criminal Case No. 12-cr-00033-JLK
|
Signed 07/18/2018

**Attorneys and Law Firms**

Gregory Allen Holloway, Beth N. Gibson, David Alan Tonini, Julia K. Martinez, U.S. Attorney's Office, Denver, CO, Erin Martha Creegan, Kiersten Jennifer Korczynski, U.S. Department of Justice-DC-Counterterrorism, National Security Division, Washington, DC, for Plaintiff.

David Barry Savitz, David B. Savitz, Law Office, Emily Elizabeth Boehme, Mitchell Baker, Mitch Baker, Attorney at Law, Denver, CO, for Defendant.

**MEMORANDUM OPINION
AND ORDER ON SENTENCING**

JOHN L. KANE, SENIOR U.S. DISTRICT JUDGE

**\*1** After his co-defendant Jamshid Muhtorov informed him that the Islamic Jihad Union (IJU) was in need of financial support, Defendant Bakhtiyor Jumaev mailed Mr. Muhtorov $300. Mr. Jumaev wrote only a single check, and the funds never reached the IJU or any other foreign terrorist organization. Mr. Jumaev had no specific plot or plan and did not intend to further any via his contribution. The idea to aid the terrorist organization was proposed and facilitated entirely by Mr. Muhtorov. Indeed, Mr. Jumaev had no direct contact with the members of any terrorist organization. And, significantly, he never committed any act of violence, nor did he advocate for any particular violent act.

Mr. Jumaev now comes before me for sentencing after having been found guilty by a jury of two counts in violation of 18 U.S.C. § 2339B, namely (1) conspiring and (2) attempting to provide material support in the form of $300 to the IJU, a designated foreign terrorist organization. Although his actions certainly are sufficient for the jury to have found him guilty of these two very serious crimes, the above summary illustrates how his guilt rests on far less culpable conduct than that of all other defendants of which I have been made aware who have been convicted under the same statute.

**I.**

**BACKGROUND**

Mr. Jumaev is a 51-year-old Muslim immigrant. He was born in 1966, in Samarkand, Uzbekistan. At that time, Uzbekistan was part of the Soviet Union and subject to repressive Soviet policies that basically outlawed religion, including Islam, the majority religion in Uzbekistan. In that environment, Mr. Jumaev completed grade school, obtained vocational training in cooking and trading in goods, served as a cook in Ukraine in the Soviet Army, and worked in his relatives' tombstone business. He also married and started a family.

Then, in 1991, Uzbekistan became a sovereign state with Islam Karimov as its President. During Karimov's 25-year reign, repressive policies and government controls took on new forms. Individuals were permitted to practice Islam but only as the regime saw fit. Religious figures were persecuted by the government for not adhering to its specifications. Access to information and freedom of the press were greatly restricted as well. In fact, Freedom House, a nonpartisan think tank in Washington, D.C., consistently gave Uzbekistan some of the lowest possible ratings for the existence of democratic freedoms. Trial Tr. at 1007:2-25; ECF No. 1832.

In the mid- to late-1990s, the economy in Uzbekistan suffered, and a large segment of the population began to migrate to other places in search of employment. Mr. Jumaev likewise suffered from the economic situation and ultimately left his family in Uzbekistan to work in Israel for two and a half years to support them. After he returned to Uzbekistan, in 1999, Mr. Jumaev was found by the Uzbek security service, known as the SNB, to be in possession of cassette tapes of religious leaders who were disfavored by the government. As a result, he was jailed, interrogated, and beaten.

**\*2** These circumstances prompted Mr. Jumaev to travel to the United States the following year on a temporary visa. He first came to New York City, but settled in Lehighton, Pennsylvania, and then Philadelphia. Soon after arriving, he was struck by a car when riding a bicycle and was severely injured. He could not work, depended on others for support, and was unable to send money to his family in Uzbekistan during his year-long convalescence. Over the following decade, Mr. Jumaev found steady employment as a gas station attendant and a custodian, living a meager lifestyle so that he could consistently send money to his wife and three sons. He frequently worked night shifts and traveled hours to and from his jobs. Still, he talked with his family on almost a daily basis until his arrest in this case.

Mr. Jumaev met his codefendant Jamshid Muhtorov in December 2009 when one of his roommates arranged for Mr. Muhtorov to stay in their apartment for a month while Mr. Muhtorov obtained his commercial driver's license. Mr. Muhtorov was also from Uzbekistan, and he and his family had moved as refugees to Denver in 2006. He had similarly experienced brutality at the hands of the Uzbek authorities and was exploring his Muslim faith in the United States.

Over the months that passed, Mr. Jumaev and Mr. Muhtorov developed a long-distance friendship in which they discussed a wide variety of topics, such as their families, Islam, current events, and the immigrant experience in the U.S. They also conversed about the Islamic Jihad Union and the Islamic Movement of Uzbekistan (IMU), the history of the two foreign terrorist organizations, and related propaganda videos they found online. In speaking about these organizations, Mr. Jumaev and Mr. Muhtorov often used ambiguous code words, like wedding, resort, Switzerland, alpinists, and sportsmen. It is clear from their communications, though, that they both sympathized with the principal goal of the two organizations—to overthrow the regime of Islam Karimov.

According to Dr. Guido Steinberg, a renowned expert in terrorism, the Islamic Jihad Union spun off from its older sister the Islamic Movement of Uzbekistan around 2001 or 2002 to focus their efforts globally and not just on Uzbekistan. In its heyday, from 2006 to 2009, the IJU had at most 100 to 200 members, but many considered it to be mostly obsolete by 2009 as its numbers dwindled to

around a dozen. The organization has been affiliated with al-Qaeda and the Afghan Taliban and has fought U.S. and coalition forces in Afghanistan.

In February 2010, Mr. Jumaev was detained by U.S. Immigration and Customs Enforcement for overstaying his visa, and his bond was set at $3,000. In order to be released and to return to work, Mr. Jumaev borrowed various amounts from friends and acquaintances, including $500 from Mr. Muhtorov.

Mr. Jumaev struggled to manage his and his family's debts after his arrest, so he did not pay Mr. Muhtorov back for many months. Mr. Muhtorov routinely hinted to Mr. Jumaev that he was having financial difficulties. And, eventually, in March 2011, Mr. Muhtorov relayed that the IJU, with which he had been communicating over the internet, was in dire need of financial support. Gov't Trial Ex. 125A at 2. Mr. Jumaev gathered $300, and used a friend's check to send the money to Mr. Muhtorov. A few days later, Mr. Jumaev asked Mr. Muhtorov if he had received the "wedding gift." Gov't Trial Ex. 128A at 1.[1] The check was later delivered and used by Mr. Muhtorov's wife for their family's expenses.

**\*3** Mr. Muhtorov bragged to Mr. Jumaev and others for months about his scheme to go to Turkey to study and then to travel to "the wedding." Mr. Jumaev encouraged Mr. Muhtorov and even stated that he was envious. *See* Gov't Ex. 131A at 3. In January 2012, Mr. Muhtorov put his plans into action. He purchased a one-way ticket to Turkey and discussed with his wife the possibility of him not returning. Before boarding the plane, though, Mr. Muhtorov was arrested. He was carrying $2,865 in cash, two new iPhones, and a new iPad.

After Mr. Muhtorov's arrest, FBI agents interviewed Mr. Jumaev twice at his house. Mr. Jumaev was not fully forthright with the agents during those interviews, specifically as to his use of code words with Mr. Muhtorov, the full scope of their discussions, and his internet activity. On March 15, 2012, Mr. Jumaev was arrested and was interrogated by FBI agents for three and a half hours. He has been in detention since that date.

Regrettably, the complexities of the evidence and the nature of the charges delayed the commencement of Mr. Jumaev's trial until March 12, 2018. The trial was extensive, lasting seven weeks and involving hundreds of

exhibits and tens of witnesses. The resources expended −to bring foreign witnesses and experts here, to depose witnesses abroad, to ensure accurate translations, to sift through mountains of evidence, and to exhaustively litigate the relevant issues−were great.

But Mr. Jumaev was entitled to a fair trial and put forward the type of legitimate defenses that necessitate a trial. He argued that he was only repaying his debt to Mr. Muhtorov, a duty that, in his culture, was incredibly important. He claimed he was oblique about the debt repayment because, according to Uzbek custom, it would have been inappropriate and even offensive to directly discuss debt repayment. Additionally, he presented Mr. Muhtorov as an exaggerator who thought was full of hot air. And Mr. Jumaev sought to demonstrate that any admissions he made during his post-arrest interrogation were involuntary, equivocal, and inconsistent.

The jury deliberated over 15 hours and recessed for a weekend before returning the verdict. The jurors undoubtedly took their responsibilities seriously and returned the verdict only after careful consideration of the evidence presented and the law given.

Post-verdict, I have received and reviewed the initial and final Presentence Investigation Reports (ECF Nos. 1885 & 1915), Mr. Jumaev's Objections (ECF No. 1910) and the Addendum (ECF No. 1916) to the Presentence Report, the government's Amended Sentencing Statement (ECF No. 1884), Mr. Jumaev's Sentencing Statement and Motion for a Variant Sentence (ECF No. 1908), Mr. Jumaev's Supplement thereto (ECF No. 1917), and Mr. Muhtorov's Memorandum Regarding Sentencing Guidelines (ECF No. 1918). Mr. Jumaev additionally submitted a letter he authored to the Court (ECF No. 1919) in which he stands on his innocence and iterates that he has been denied his right to a speedy trial and other arguments as to why he believes he was denied a fair trial. I have considered all of these submissions, including the contents of Mr. Jumaev's letter, in reaching the conclusions detailed below.

## II.

### THE U.S. SENTENCING GUIDELINES RANGE [2]

**\*4**  I have previously notified the parties that I find the U.S. Sentencing Guidelines to be illogical and inadequate for sentencing Mr. Jumaev. I elaborate on that conclusion further below. But, first, I calculate the applicable Guidelines range as required. *See Gall v. United States, 552 U.S. 38, 49 (2007).* If the following calculation is in error, however, it has no impact on the eventual sentence. *See United States v. Sabillon-Umana, 772 F.3d 1328, 1334 (10th Cir. 2014)* (acknowledging that remanding for resentencing does not help the defendant or enhance the integrity of judicial proceedings when a district judge analyzes a case under alternative theories and indicates he or she would arrive at the same sentencing conclusion either way); *United States v. Gieswein, 887 F.3d 1054, 1062-63 (10th Cir. 2018).*

### A. Calculation of the Guidelines Range

U.S. Sentencing Guideline § 2M5.3(a) sets the Base Level for a conviction under 18 U.S.C. § 2339B at 26. Mr. Jumaev's two counts are grouped together under the Sentencing Guidelines because they involve a common criminal objective and constitute part of a common scheme or plan. *See U.S.S.G. § 3D1.2.* [3]  Mr. Jumaev has no known criminal history, making his Criminal History Category I. So, without any adjustments or departures, Mr. Jumaev's Guidelines range would be 63 to 78 months' imprisonment.

The Guideline for convictions under 18 U.S.C. § 2339B, however, provides for a two level increase "[i]f the offense involved the provision of (A) dangerous weapons; (B) firearms; (C) explosives; (D) funds with the intent, knowledge, or reason to believe such funds would be used to purchase any of the items described in subdivisions (A) through (C); or (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act ...." U.S.S.G. § 2M5.3(b)(1).

The government claims that Mr. Jumaev had a reason to believe that the funds he provided would be used to obtain dangerous weapons or firearms or to commit or assist in the commission of a violent act. As support, it relies on Mr. Jumaev's viewing of IJU and IMU terrorist propaganda videos, his discussions with Mr. Muhtorov on their duty to participate in the "wedding," and his comments on YouTube videos in support of violent jihad. Mr. Jumaev was familiar with the IJU's purpose and its

activities and readily admitted to knowing that it was a foreign terrorist organization. Thus, he necessarily had a reason to believe, at a minimum, that any funds provided to the IJU would have been used to commit or assist in the commission of a violent act. I find the two-level increase under § 2M5.3(b) is applicable. That finding bumps Mr. Jumaev's offense level up to 28, resulting in a range of imprisonment of 78 to 97 months.

That is not the end of the story, though. For crimes related to terrorism, I must evaluate the application of the so-called Terrorism Enhancement in U.S.S.G. § 3A1.4. And, here, I must also address the government's suggestion that I apply the Obstruction of Justice Enhancement in § 3C1.1 as well as Mr. Jumaev's entreaty that I apply the mitigating role adjustment in § 3B1.2 and the criminal history and aberrant behavior departures in §§ 4A1.3 and 5K2.20, respectively.

*Adjustments*

1. § 3A1.4: Terrorism Enhancement
**\*5** The Terrorism Enhancement, when applied, "takes a wrecking ball" to the initial Guidelines range. George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014). It functions by both increasing the offense level at least 12 levels and elevating the defendant to the highest Criminal History Category, irrespective of his or her actual criminal history. In full, the Terrorism Enhancement states:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32**.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4. The "federal crime of terrorism" the Enhancement references is that defined in 18 U.S.C. § 2332(g)(5): "[A]n offense that—(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of—[a list of enumerated offenses, including] (i) section ... 2339B (relating to providing material support to terrorist organizations) ...." If the Enhancement were to apply

to Mr. Jumaev's offenses, his sentencing range would skyrocket to 360 months' imprisonment.

The government's argument regarding application of the Terrorism Enhancement is disappointing. For such a "draconian" enhancement,[4] I would expect the government to muster more than a single paragraph justifying its application. The government's entire argument is:

> The record is replete with evidence that JUMAEV and MUHTOROV intended to retaliate against the actions of both the Uzbek and United States Government. Further, the offense conduct here was plainly one that "involved, or was intended to promote," the crimes listed above. U.S.S.G. § 3A1.4(a). Indeed, violations of 18 U.S.C. § 2339B, the counts of conviction, are specifically listed in the definition of a "Federal crime of terrorism." JUMAEV explained his anger at both the Uzbek and U.S. government to agents during his interview on March 15, 2012. Accordingly, the defendants' offense level [sic] should be increased by 12 levels.

Gov't's Am. Sentencing Statement at 10-11, ECF NO. 1884.[5] Mr. Jumaev, in turn, spends seven pages presenting the specific standard for application of the enhancement and demonstrating that the record does not fulfill that standard. If I were to base my ruling on the efforts of the parties alone, I would find the enhancement inapplicable. I do not, however, fall into this temptation.

I base my ruling instead on the standard taken from *United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010). There, the Second Circuit explained that the disjunctive phrase from U.S.S.G. § 3A1.4—if the offense involved, OR was intended to promote, a federal crime of terrorism—"makes clear that the predicate offense must either (1) 'involve' a federal crime of terrorism or (2) be 'intended to promote' a federal crime of terrorism, and that each clause has a separate meaning." *Awan*, 607 F.3d at 313. "A defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, *i.e.*, the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5), or his relevant conduct includes such a crime." *Id.* at 313-14. Since Mr. Jumaev's convictions are under 18 U.S.C. § 2339B, a crime enumerated in § 2332(g)(5)(B), I must only find, under that prong,

that Mr. Jumaev had the "specific intent" to commit offenses that were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *See id.* at 316-17. " 'Calculation' is concerned with the object that the actor seeks to achieve through planning or contrivance ... Section 2332b(g)(5)(A) does not focus on the defendant but on his 'offense,' asking whether it was calculated, *i.e.,*, planned—for whatever reason or motive—to achieve the stated object." *Id.* at 317.

**\*6** Alternatively, "[t]he 'intended to promote' prong applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." *Id.* at 314. So, even if Mr. Jumaev's offenses were not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," the terrorism enhancement may apply if, with his offenses, he intended to promote another's commission of a crime in § 2332b(g)(5)(B) that was. *See id.* at 314-15. "[A]n offense is 'intended to promote' a federal crime of terrorism when the offense is intended to help bring about, encourage, or contribute to" such a crime. *Id.* at 314.

Under both the "involves" or the "intended to promote prong," then, the Terrorism Enhancement only applies if I find that Mr. Jumaev had some intent that was not required for the jury to find him guilty. *See* Jury Instructions at 25, 29, ECF No. 1794-2 (requiring only knowledge for convictions under 18 U.S.C. § 2339B). I struggle to find that Mr. Jumaev had either the specific intent to commit crimes that were calculated to influence, affect, or retaliate against a government or the intent to promote another's federal crime of terrorism when the jury's conviction of him could rest only on his knowledge. Mr. Jumaev convincingly argues that he both could have intended to repay his debt to Mr. Muhtorov while knowing that the funds would go to support a foreign terrorist organization. I have no reason to believe that Mr. Jumaev would have ever sent money to the IJU if he had not been arrested by ICE and been loaned money by Mr. Muhtorov. Mr. Jumaev's offenses are the result of a convergence of factors that I detail throughout this Order, the most significant of which is that he owed a debt. The facts of this case are unique for that reason.

I cannot and do not find, under the "involves" prong, that Mr. Jumaev's offenses were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Although Mr. Jumaev may have wished for the overthrow of Uzbek President Islam Karimov or perhaps even for the U.S. government to alter its foreign policy, his offenses were not calculated to achieve that object. *See Awan*, 607 F.3d at 314. My best justification for that determination is common sense. Mr. Jumaev gave only $300 to a person who himself was short on cash and did not even know how to get the money to the intended organization. If Mr. Jumaev's offenses were truly calculated towards a political objective, Mr. Jumaev would have done more, e.g., contributed more money on more occasions via a more reliable conduit to a more robust organization. Simply put, his offenses were not calculated at all.

To fall within the "intended to promote" prong, Mr. Jumaev must have committed his offenses with the intent to help bring about, encourage, or contribute to another person's commission of a federal crime of terrorism. [6] Again, I am unable to find that Mr. Jumaev *intended* anything more than to repay his debt. The record does contain evidence that Mr. Jumaev would have approved of the commission of certain federal crimes of terrorism. But, as Mr. Jumaev asserts, there is no evidence in the record that he knew about, and certainly not that he intended to promote, any plan by the IJU to commit a politically-motivated crime of terrorism. This is underscored by the fact that Mr. Jumaev never had any direct contact with the IJU and that the organization was nearly defunct at that time. Even if it were sufficient for Mr. Jumaev to have intended generally to bring about, encourage, or contribute to federal crimes of terrorism, the government has not conclusively established that he sent Mr. Muhtorov the $300 check with that intent. I, therefore, find that the Terrorism Enhancement is inapplicable to Mr. Jumaev's offenses. [7]

### 2. § 3C1.1: Obstruction of Justice Enhancement

**\*7** The government additionally contends that the two-level Obstruction of Justice Enhancement appears to apply because Mr. Jumaev committed perjury in testifying at trial and provided materially false information to the Court. The enhancement only applies when:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense ....

U.S.S.G. § 3C1.1. Application Note 4 to the Guideline provides as examples of qualifying conduct: "committing, suborning, or attempting to suborn perjury, ... if such perjury pertains to conduct that forms the basis of the offense of conviction" and "providing materially false information to a judge or magistrate judge."

In determining what constitutes perjury for the purposes of the Obstruction of Justice enhancement, I rely on the federal criminal perjury statute, 18 U.S.C. § 1621. "A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). "[N]ot every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury .... [The accused's] testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or to prove lack of intent." *Id.* at 95.

I will not speculate from the jury's verdict what testimony it rejected and what it accepted, and I cannot conclude, as the government does, that its conviction of Mr. Jumaev establishes that his testimony was false. The government provides as examples of his "lies" his testimony "that his $300 payment to MUHTOROV was repayment of a debt and not intended for the IJU, that he thought MUHTOROV was joking when he told the defendant about his contact with the IJU, and that he did not [believe] [8] MUHTOROV intended to travel in order to join the IJU." Gov't Am. Sentencing Statement at 11. But the jury could have convicted Mr. Jumaev even while finding all of those statements to be true. Perhaps the jurors believed Mr. Jumaev's testimony that Mr.

Muhtorov was an exaggerator and braggart but thought it was insufficient to counter his knowledge. I will not presume.

In over forty years of judging I have never imposed a harsher sentence because a defendant asserted his right to trial by jury or to testify at that trial. I am not about to do so now or in the future. I consider any trial "tax" or penalty to be contrary to the ages-long values and standards of our legal system. [9] It is more closely associated with the jurisprudence of Russia, as described by Dostoyevsky, than our own tradition as described by Benjamin Cardozo. In that vein, application of the Obstruction of Justice Enhancement here would be a violation of the concepts of justice and of ordered liberty.

### 3. § 3B1.2: Mitigating Role Adjustment

**\*8** Mr. Jumaev first argues that his offense level should be decreased two to four levels under U.S.S.G. § 3B1.2(a) and (b) because his role in the offense was appreciably less than Mr. Muhtorov's. U.S.S.G. § 3B1.2 instructs:

> Based on the defendant's role in the offense, decrease the offense level as follows: (a) If the defendant was a minimal participant in any criminal activity, decrease by **4** levels. (b) If the defendant was a minor participant in any criminal activity, decrease by **2** levels. In cases falling between (a) and (b), decrease by **3** levels.

U.S.S.G. § 3B1.2. While Mr. Jumaev's culpable conduct overall certainly pales in comparison to Mr. Muhtorov's, he was not a minimal or minor participant in the crimes with which he was convicted. Mr. Muhtorov made contact with IJU and was to deliver the funds, but the support that was to be provided originated with Mr. Jumaev and he was aware of and a participant in the full scope of the crime.

*Departures*

### 1. § 5K2.20: Aberrant Behavior Departure

Moving on to the departures Mr. Jumaev suggests, a downward departure may be warranted under U.S.S.G. § 5K2.20 "in an exceptional case" if "(1) the defendant's criminal conduct meets the requirements of subsection (b);

and (2) the departure is not prohibited under subsection (c)." U.S.S.G. § 5K2.20(a). Here, none of the prohibitions in subsection (c) apply. Subsection (b) reads:

> The court may depart downward under this policy statement only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life.

U.S.S.G. § 5K2.20(b). Application Note 3 to § 5K2.20 permits me to consider "the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense."

Until his immigration arrest, Mr. Jumaev had no interactions with law enforcement and held steady employment in the U.S. for almost ten years. His greatest concern in life was and I imagine still is providing for his family. Although his discussions with Mr. Muhtorov regarding the IJU and IMU and his admiration for them spanned years, he wrote only a single check. It is unclear what his motivation was in doing so, but as I found above, it was not a calculated action. He has been in detention for 76 months and has only three disciplinary incidents, all of which related to disagreements with staff. Presentence Report at 4, ECF No. 1915. Considering all the evidence, Mr. Jumaev is most likely to continue with his "otherwise law-abiding life" once this case has terminated. I do have some reservation in applying this departure because I am troubled by Mr. Jumaev's failure to be fully forthright with law enforcement during their two interviews with them in early 2012 and by his testimony at trial revealing that his asylum application contained exaggerations. Nevertheless, I find that reduction of the offense level by two levels is justified under § 5K2.20. [10]

**2. § 4A1.3: Criminal History Departure**

**\*9** For many of the same reasons that I depart under that provision, I determine that, if the Terrorism Enhancement were applicable to Mr. Jumaev's offenses, his criminal history would be overrepresented and he should benefit

from a departure under U.S.S.G. § 4A1.3 as well. Section 4A1.3 provides: "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. § 4A1.3(b)(1). The Terrorism Enhancement would move Mr. Jumaev, a 51-year-old with no criminal history, from a Criminal History Category of I to VI. "A judge determining that [the Terrorism Enhancement] over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing." United States v. Meskini, 319 F.3d 88, 92 (2003); United States v. Benkahla, 501 F.Supp.2d 748, 758 (2007) (applying the Terrorism Enhancement and then a downward departure under § 4A1.3 to drop the defendant's criminal history category from VI back down to I).

Judge George O'Toole has eloquently explained the most salient reasons for departing under § 4A1.3 when the Terrorism Enhancement applies:

> [T]he automatic assignment of a defendant to a Criminal History Category VI is not only too blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of the Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness.

United States v. Mehanna, No. 1:09-cr-10017-GAO (D. Mass. April 12, 2012), Sentencing Tr. at 69:14-24, ECF No. 439. The assignment of a Criminal History Category of VI via the Terrorism Enhancement is purportedly based on the notion that, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Meskini, 319 F.3d at 92. But:

> There is no published statistical data demonstrating that defendants convicted of violating 18 U.S.C. §§ 2339B, 2339C, or other anti-

terrorism statutes−and especially those convicted of financing offenses −are any more likely to be recidivists than any other first offenders. Nothing in the history of U.S.S.G. [§] 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist.

James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 114-15 (2010) (footnotes omitted). Furthermore, with respect to Mr. Jumaev specifically, there is no indication that he is likely to recidivate or would be difficult to rehabilitate. [11] If the Terrorism Enhancement were applicable to Mr. Jumaev's offenses, I would depart under § 4A1.3 to lower him back down to Criminal History Category I.

*Final Guidelines Range*
At long last, I arrive at the appropriate Guidelines range for Mr. Jumaev's offenses. The offense level is 26, after applying the enhancement in § 2M5.3(b), finding inapplicable the Terrorism and Obstruction of Justice Enhancements and the Mitigating Role Adjustment, and departing under § 5K2.20. Mr. Jumaev remains at a Criminal History Category I. The Guidelines range is, therefore, 63 to 78 months' imprisonment with one year to life of supervised release and a $12,500 to $125,000 fine.

B. Rejection of the Guidelines
I reject the Sentencing Guidelines in this case and instead find it appropriate to sentence Mr. Jumaev pursuant to the factors set forth in 18 U.S.C. § 3553(a). My reasons for doing so are multitudinous. Principally, I have concluded this case presents circumstances not adequately taken into consideration by the Sentencing Commission. [12] These points are detailed in the following Section, but include Mr. Jumaev's owing of a debt, his extended period of pretrial detention, his prolonged absence from his family, his immigration situation, and the lack of rehabilitation programs for him.

**\*10**  The Terrorism Enhancement further exemplifies this lack of consideration by the Sentencing Commission. [13] The Violent Crime Control and Law Enforcement Act of 1994 directed the U.S. Sentencing Commission to "amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime." Pub. L. No. 103–322, 108 Stat. 1796 (1994). The Sentencing Commission carried out that directive by promulgating § 3A1.4 of the Sentencing Guidelines. [14] I explained above that the Terrorism Enhancement in § 3A1.4 functions by both increasing the offense level and the defendant's Criminal History Category, moving the Guidelines range to the far right-hand corner of the prized Sentencing Table.

I have two principal objections to this operation of the Terrorism Enhancement. [15] First, it is not backed by any empirical evidence. [16] And, second, treating all "terrorists" alike is impermissible under our sentencing paradigm and has significant ripple effects. This second point I must spend some time on.

While U.S.S.G. § 2M5.3 has an "internal enhancement mechanism to calibrate the severity of the sentence to the culpability of the conduct and the harm," McLoughlin, *supra*, at 73, that distinction is lost with the Terrorism Enhancement, which frequently results in Guidelines ranges that equal the maximum statutory sentence and fail to differentiate between various levels of conduct. [17] For example, the Terrorism Enhancement would punish an individual who collects $1,000 for al-Shabaab without having any contact with the organization, *see United States v. Moalin*, No. 3:10-cr-04246 (S.D. Cal.), Nasir Sentencing Tr. at 18:7-19:8, 25:20-21, ECF No. 468 (calculating the Guidelines range as 15 years for § 2339B count), the same as someone who maintained direct and continuing contact with a high-ranking member of al-Shabaab and offered the use of his house as a haven for the organization's fighters and to store bombs and other weapons, *see id.*, Moalin Sentencing Tr. at 50:5-25, ECF No. 449 (calculating the Guidelines range as 15 years for § 2339B counts).

"Deconstructing defendants and their offenses, and placing both on the spectrum of similar defendants

convicted of similar crimes, is classic sentencing practice. It requires nuance and careful discrimination between and among cases and defendants based on the factors enumerated in 18 U.S.C. § 3553. That nuance is impossible under a Guideline that is structured as bluntly as U.S.S.G. [§] 3A1.4.

**\*11** McLoughlin, *supra*, at 108 (footnotes omitted). As demonstrated by the almost universal application of the Terrorism Enhancement to crimes related to terrorism, the additional findings it requires do not remedy its lack of calibration.

The Guidelines were developed to "further the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation." U.S.S.G. Ch.1, Pt. A. In enacting the Sentencing Reform Act of 1984, "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." Additionally, it "sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." *Id.* As countless others have commented, the Terrorism Enhancement runs contrary to these aims. [18] The circumstances of individuals convicted of crimes of terrorism (or who intended to promote crimes of terrorism) differ greatly, and sentencing them without crediting those differences results in disproportionate sentences and disparities in sentencing. Some of the distinguishing factors that should be considered are "the 'materiality' of their support, the intent with which they gave the support, the organization to which the support was given, the quality and quantum of the support, the duration of the support, the identifiable harm caused by the support, and any identifiable victim of the support." McLoughlin, *supra*, at 100. But the Terrorism Enhancement does not permit consideration of any of those aspects. [19]

**\*12** In considering the Enhancement, Professor George D. Brown has posited the question: "Is terrorism sufficiently unique (and dangerous) that it justifies a sentencing 'rule' that goes against notions of individualized sentences that reflect the inevitable differentiation among criminals?" Brown, *supra*, 520. The answer is that it is not. [20] There is no rational basis for concluding that all individuals labeled as "terrorists" and all crimes of "terrorism" are equal. "Gradation of

offenses" is an important value in criminal law. George D. Brown, *Notes on A Terrorism Trial - Preventive Prosecution, "Material Support" and the Role of the Judge After United States v. Mehanna*, 4 Harv. Nat'l Sec. J. 1, 54 (2012). "We do not treat a purse-snatcher like a rapist, [yet t]he Enhancement reflects a different view: a terrorist is a terrorist." *Id.* The requirement to view any terrorist as every terrorist goes against the basic principles of sentencing and the factors set forth in 18 U.S.C. § 3553. Here, the application of the Terrorism Enhancement to Mr. Jumaev's offenses, the facts of which have proven to be unique and deserving of specific consideration, would be cruel and unreasonable.

A just sentence is an act for which a judge is morally responsible. That responsibility can neither be shunned nor relinquished based on the nature of the crime. [21] We must recognize that a human being is the focal point of the sentencing process and should not be ignored or dismissed because of the inflamed rhetoric of the "war on terror." [22] I am reminded of Judge Learned Hand's wise comment: "If we are to keep our democracy, there must be but one commandment: Thou Shalt Not Ration Justice."

**\*13** Let us then begin:

> [W]ith the simple recognition that the Sentencing Guidelines are based on a fundamental misconception about the administration of justice: the belief that just outcomes can be defined by a comprehensive code applicable in all circumstances, a code that yields a quantitative measure of justice more easily generated by a computer than a human being. We must recognize, in other words, that no system of formal rules can fully capture our intuitions about what justice requires.

Kate Stith and Judge José A. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 168-69 (1998).

III.

APPLICATION OF 18 U.S.C. § 3553(a) FACTORS

In rejecting and varying from the Sentencing Guidelines, I am intent on crafting a sentence for Mr. Jumaev that is "sufficient, but not greater than necessary ... (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). I am also concerned with the nature and circumstances of the offense and the history and characteristics of Mr. Jumaev as well as the kinds of sentences available and the need to avoid unwarranted sentencing disparities. *See id.* § 3553(a).

A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

I first consider the nature and circumstances of the offense and Mr. Jumaev's history and characteristics. Although Mr. Jumaev's offense only involves a single check on a single occasion, the surrounding events are troublesome. Mr. Jumaev not only watched and discussed videos that I find to be repulsive in many ways, but he commented on the videos, saying things like "Hey you, immoral, hypocrite infidels! Your days are over whether you like it or not. Now it is your turn. We will not let you have peace because God's promise is true." Gov't Ex. 26A at 1. I also am concerned by Mr. Jumaev's encouragement of Mr. Muhtorov on his path. *See, e.g.* Gov't Ex. 127A ("[Y]ou're my teacher. Do you know that Abumumin? ... [L]et me tell you the truth ... when it comes to the matter with wedding festivities, I think it is you who is really walking the walk."). Even if he believed Mr. Muhtorov to be joking, he could have disagreed with him, distanced himself from him, or simply not encouraged him.

A common recitation in the criminal law regarding a defendant's intent is that we cannot know another person's mind. But Mr. Jumaev's testimony, his recorded comments, and interactions with others give an idea of his sense of identity and self-perception.

There are reasons why Mr. Jumaev acted as he did and they are to be found in his conduct, not in some

Manichaean struggle between good and evil. It is clear that Mr. Jumaev became a participant in supporting a terrorist organization because of traumatic events in his life. The extent to which he was abused and tortured by the government in Uzbekistan is problematic, but the evidence is overwhelming that he and other unfortunate citizens of that country were subjected to deprivations of basic human rights and significant diminishment of individual worth. No matter how horrible the language and circumstances of the Islamic fundamentalism he embraced, he was searching for a structure and belief system that would validate his existence. That he accepted or tacitly endorsed versions of Islam favored by militants is explained more by the social milieu in his exile from home and family than by any doctrinal epiphany.

**\*14** In the most favorable terms, Mr. Jumaev sought and gained employment, worked long and arduous hours in the United States and all the while maintained communication with his wife and family and provided them with financial support. For him, the friendship he developed with Mr. Muhtorov and the form of Islam he eventually embraced presented a promise of social justice that would right the many wrongs he had seen and experienced in his homeland of Uzbekistan, his separation from his family, and his anomie while in the United States. While the actions of jihadis stem from what many consider to be misinterpretations of the Holy Quran, Mr. Jumaev took on this cause, in a minimally supportive way, because it gave him a sense of purpose and value in the fight against social injustice and economic deprivation to which his family and he were subjected.

His sentiments and speech were clearly supportive of the IJU and therefore viewed with grave suspicion and little sympathy, yet they must be considered for sentencing purposes as reflections of his great need for identification rather than as evidence of a deliberate intention to do evil. The complete absence of violence in this case provides a window into how he saw himself and why he succumbed to the pressures he experienced. Such were the causes of his behavior. To be sure, he was influenced by others, perhaps too easily, but he did not act in any manner as an instigator or leader or conduit for others to engage in similar conduct.

B. The Need for the Sentence Imposed

The crimes with which Mr. Jumaev has been convicted are undoubtedly grave and he must be sentenced accordingly.

"The material-support statute is, on its face, a preventative measure−it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010). "When it enacted [18 U.S.C.] § 2339B in 1996, Congress made specific findings regarding the serious threat posed by international terrorism." *Id.* at 29. Specifically, it found: " '[F]oreign organizations that engage in terrorist activity are so tainted by their criminal conduct that *any contribution to such an organization* facilitates that conduct.' " *Id.* (quoting Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), § 301(a)(7), 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose) ).

*To Reflect the Seriousness of the Offense, To Promote Respect for the Law, and To Provide Just Punishment*
Recognizing the seriousness of the offense, I nevertheless find the government's request for a sentence of 15 years' imprisonment to be absurd. The NYU Center on Law and Security determined that, for the 548 cases from 2001 to 2012 involving crimes inspired by jihadist ideas, the *average* sentence imposed was 14 years' imprisonment. Ctr. on Law & Sec., N.Y.U. Sch. of Law, *Terrorist Trial Report Card: September 11, 2001-September 11, 2011*, at 7 (2011) (emphasis added). The government provides no basis for why Mr. Jumaev's offenses are above average.

To arrive at the appropriate sentence, I ask: What sentence is necessary to convey that *any* support for terrorism will not be tolerated? I believe that message has been sent in this case. Mr. Jumaev has already been subjected to significant punishment. He has spent 76 months in pretrial detention in Denver, far from his friends in Pennsylvania and even farther from his family in Uzbekistan and elsewhere. During that period, he has only been able to see one of his sons via videoconference for 10 minutes. He has been unable to provide for his family, his longstanding role. Mr. Jumaev also has lived with the knowledge that his communications with his family and friends were monitored for an extended period of his life, such that his private concerns have become public. At trial, the government even took the liberty of commenting on his absence as a father in his children's lives. I have no doubt that Mr. Jumaev's time in detention and his experience throughout the investigation and prosecution of this case do not "trivialize" his actions. *See* Gov't's Sentencing Statement at 14.

**\*15** If I imposed a term of imprisonment over the time Mr. Jumaev has already served, additional disparate consequences are possible or even likely. Muslims frequently experience discrimination while incarcerated. The U.S. Department of Justice Office of the Inspector General Reports to Congress on Implementation of Section 1001 of the USA Patriot Act illustrate the discriminatory treatment Muslims face while incarcerated. [23] Since Mr. Jumaev has been convicted of crimes related to terrorism, it also would not be unheard of for him to be subjected to harsher conditions or restrictions while imprisoned. [24]

*To Afford Adequate Deterrence to Criminal Conduct*
While the message is clear that the U.S. prosecution of terrorism crimes is unrelenting and inexorable, I am not positive I would be sending an effective message of deterrence by sentencing Mr. Jumaev to a longer term of imprisonment. It is possible instead that I would be encouraging the commission of more serious crimes, given that the sentence would be the same regardless. [25]

Many commentators warn against unnecessarily lengthy sentences for terrorism offenses. [26] One of the reasons behind those warnings is the possibility of further "radicalization" while in prison. "Prison systems throughout the world have been and continue to be breeding grounds for radicalism, recruiting grounds for extremist movements, and facilities for the planning and training of radical activities." Office of the Inspector Gen., U.S. Dep't of Justice, *A Review of the Federal Bureau of Prisons' Selection of Muslim Religious Services Providers* 6 (2004), *available at* https://oig.justice.gov/special/0404/final.pdf. [27]

> [I]n recent years, policy decisions have produced shortages in Islamic leadership .... The lack of trained leadership ... renders the religion at perpetual risk of being guided by inmates who can hardly deliver authoritative spiritual guidance. More critically, it allows individuals to exploit the pulpit, depart from traditional teachings, and even propagate an extremist agenda.

SpearIt, *Muslim Radicalization in Prison: Responding with Sound Penal Policy or the Sound of Alarm?*, 49 Gonz. L. Rev. 37, 60-62 (2013). [28] These factors weigh against a protracted additional term of imprisonment.

*To Protect the Public from Further Crimes of the Defendant*

**\*16**  Mr. Jumaev has no criminal history, and as I have already stated, there is no indication that he will recidivate. He is subject to deportation and may never again be out-of-custody in the U.S. The government contends that Mr. Jumaev's conduct reflects a clear upward trajectory indicating that, "if left unchecked," Mr. Jumaev would have "endeavored to continue his support and expand his support." *See* Gov't Argument at 7/18/18 Sentencing Hr'g. I am not persuaded in the least bit by this argument. Mr. Jumaev wrote the $300 check in March 2011. He was not arrested in this case until March 2012. Yet, during that year period, there is no evidence that he committed any other crime or attempted to support terrorism in any other way. When Mr. Muhtorov finally told Mr. Jumaev he was leaving for Turkey, Mr. Jumaev did not write him another check to take with him or try to assist him with his travel.

As Judge Janet Hall found in *United States v. Ahmad*, No. 3:04-cr-00301-JCH (D. Conn. July 16, 2014), [29] I cannot sentence Mr. Jumaev on an unfounded fear that he might do something and extend his sentence as a result. I must look at what he actually did and determine whether it is likely that he will do something similar or greater in the future. From the facts before me, I find it is not.

*To Provide the Defendant with Needed Training, Medical Care, or Other Treatment*

To my knowledge, the Bureau of Prisons offers no relevant training or rehabilitation programs available for Mr. Jumaev and his crimes. [30] This is significant, because there is little hope that the negative influences resulting from a longer period of incarceration will be balanced with a productive program. I have considered the opportunity for Mr. Jumaev to pursue additional education opportunities while imprisoned [31] but have determined that potential benefit is outweighed by the other factors.

## C. The Kinds of Sentences Available

Mr. Jumaev has now been in detention for 2,316 days. I could impose an additional term of imprisonment up to the maximum sentence under the statute−15 years for each count, or I sentence him to the time he has already served. Sentencing him to a term of less than the 2,316 days he has spent in detention would be meaningless at this point. Violations of 18 U.S.C. § 2339B can also carry a maximum fine of up to $250,000 and up to a life term of supervised release.

In evaluating the sentences available, I consider the immigration consequences and available forms of relief for Mr. Jumaev as well. I commend defense counsel for their thoroughness in presenting the related material for sentencing purposes. *See* Jumaev's Sentencing Statement at 27, ECF No. 1908; *Id.* Ex. C at 1-4, ECF No. 1908-1. Mr. Jumaev is currently in immigration removal proceedings and will likely be detained by Immigration and Customs Enforcement as soon as he is released from custody in this case. Mr. Jumaev could then be removed to Uzbekistan and face an uncertain future there or could be detained here for an extended period pursuant to the Convention Against Torture. *See id.* at 4; *Yusupov v. Attorney Gen. of United States*, 650 F.3d 968, 977-79, 993 (3d Cir. 2011) (discussing the likelihood that the petitioners, two Uzbek nationals, would be persecuted and tortured if removed to Uzbekistan because of their religious and political beliefs; explaining the forms of relief available and the impact of a determination that an alien is a danger to the security of the U.S.; and holding that the government had not proved that the petitioners were a danger to the security of the U.S. so they were entitled to mandatory withholding of removal). Either way, his options are bleak, and continued detention separate from this case is most probably in his future. Additionally, as a result of his immigration status and the corresponding proceedings, any period of supervised release imposed will likely be an unrealized figment of his sentence.

## D. The Need to Avoid Unwarranted Sentence Disparities

**\*17**  Finally, I must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Understanding that the Sentencing Guidelines are not useful for avoiding sentencing disparities in terrorism-related cases, I ordered

the parties and the Probation Office to submit summaries of previous cases in which a defendant has been convicted under 18 U.S.C. § 2339B. I have reviewed their submissions along with the relevant cases listed in the Sentencing Compilation Matrix prepared by the defense in *United States v. Ahmad*.[32] While the material support statutes, 18 U.S.C. §§ 2339A and 2339B, have been among the most frequently prosecuted federal anti-terrorism statutes,[33] there are only a few cases that bear enough likeness to Mr. Jumaev's to be worthy of comparison, and even these are readily distinguishable.[34] The following material support cases are similar to this case in that they all involve financial contributions, but as is apparent, each of the defendants engaged in substantially more culpable conduct than Mr. Jumaev, such as participating in intricate conspiracy networks, contributing considerable sums of money, providing support on a recurrent basis, joining in recruitment efforts, plotting against the United States, and so on.

### Mohamed Bailor Jalloh [35]

Mohamed Bailor Jalloh provided $340 to an ISIS official while he was in Africa with the U.S. National Guard. Upon returning to the United States, he provided $500 to an FBI confidential informant. He also researched and attempted to purchase an AK-47 assault rifle. Mr. Jalloh pleaded guilty, in *United States v. Jalloh*, No. 1:16-cr-0163 (E.D. Va. 2016), to one count of providing material support to a foreign terrorist organization. The sentencing judge noted that Mr. Jalloh was willing to take significant steps to support ISIS and knew that the ISIS official was plotting attacks in the United States. The judge sentenced him to 132 months' imprisonment with five years of supervised release.

### Nicholas Young

Nicholas Young was a police officer in Washington, D.C., and while in that service, provided gift cards intended for ISIS to an FBI informant. In *United States v. Young*, No. 1:16-cr-00265 (E.D. Va. 2016), Mr. Young was found guilty by a jury of two counts of attempting to obstruct justice in violation of 18 U.S.C. § 1512(c)(2) and of one count of violating § 2339B. He was sentenced to 180 months' imprisonment with 15 years of supervised release.

### Haris Qamar

At the behest of an FBI confidential informant, Haris Qamar purchased gift cards worth $80 that he believed would eventually be sent to ISIS. Mr. Qamar and the confidential informant also took pictures of monuments for a video that ISIS was purportedly making to encourage lone wolf terrorist attacks in Washington, D.C. Prior to the involvement of the FBI, Mr. Qamar bought a plane ticket with the intent of going to join ISIS, but he abandoned that plan after his parents took his passport. Mr. Qamar pleaded guilty, in *United States v. Qamar*, No.1:16-cr-00227 (E.D. Va. 2018), to one count of attempting to provide material support to a foreign terrorist organization. He was sentenced to 102 months' imprisonment with 20 years of supervised release.

### Raja Lahrasib Khan

Raja Lahrasib Khan supported Kashmir independence from India, and on a trip to Pakistan, he provided the leader of the Kashmir independence movement, Ilyas Kashmiri, with approximately $200 to $250 to use for attacks against the Indian government. Upon his return to the United States, he sent funds to Pakistan and instructed that $300 go to Kashmiri. He later accepted $1,000 from an undercover law enforcement agent and agreed to provide the funds to Kashmiri. The undercover agent claimed to be interested in sending money to Kashmiri only if he was working with al-Qaeda. Mr. Khan confirmed that Kashmiri was working with al-Qaeda and arranged for the funds to be delivered to him. In *United States v. Khan*, No. 1:10-cr-00240 (N.D. Ill. 2010), Mr. Khan pleaded guilty to one count of attempting to provide material support to a foreign terrorist organization and was sentenced to 90 months' imprisonment with lifetime supervised release.

### Basaaly Saeed Moalin

**\*18** Basaaly Saeed Moalin collaborated with al-Shabaab leadership and even offered to provide them with a house in Mogadishu to hide weapons and to advance their agenda. In *United States v. Moalin*, No. 3:10-cr-04246 (S.D. Cal. 2010), Mr. Moalin and his co-defendants were found guilty by a jury of conspiracy to provide material support to terrorists, conspiracy to provide material support to a foreign terrorist organization, and conspiracy to launder monetary instruments. Mr. Moalin was also found guilty of actually providing material support to terrorists and to a foreign terrorist organization. On those five counts, Mr. Moalin was sentenced to a total of

216 months' imprisonment with three years of supervised release. Observing that Mr. Moalin went so far as to counsel al-Shabaab leadership on how to bury bombs and other munitions on his property, the judge concluded that his actions "went beyond mere financial support and entered into the realm of a different type of support," deserving of three of the years on one of his counts to run consecutive to the other concurrent 15-year sentences. *Moalin*, No. 3:10-cr-04246, Sentencing Tr. at 57:18-22.

### Mohammad El-Mezain

Both before and after Hamas was designated as a foreign terrorist organization in the 1990s, Mohammad El-Mezain served as one of the officers and directors of a charitable foundation that operated as its fundraising arm. The foundation supported Hamas by funneling millions of dollars to committees in Palestine, which Mr. El-Mezain knew were controlled by Hamas. In *United States v. Holy Land Foundation for Relief and Development*, No. 3:04-cr-0240 (N.D. Tex. 2004), Mr. El-Mezain was found guilty by a jury of a single count of conspiracy to provide material support to Hamas. For that crime, he was sentenced to 180 months' imprisonment with three years of supervised release.

### Hinda Osman Dhirane and Muna Osman Jama

Hinda Osman Dhirane and Muna Osman Jama organized a "Group of Fifteen," which included women from Minnesota, Canada, Europe, and Africa, that met regularly in a chat room to organize and track payments that would fund al-Shabaab operations. In *United States v. Jama*, No. 14-cr-00230 (E.D. Va. 2014), Ms. Dhirane and Ms. Jama were found guilty of one count of conspiracy to provide material support to the terrorist organization al-Shabaab after a bench trial. The women were also found guilty of multiple counts of providing material support based on the numerous payments and transfers of funds that occurred after they joined the conspiracy. Ms. Jama was convicted of making 20 separate payments totaling $4,700, and Ms. Dhirane was convicted of making approximately $1,000 in contributions through her participation in the conspiracy when those payments were made. The sentencing judge stressed that the defendants solicited and recruited others to contribute funds, and that "there was a substantial level of organization, subterfuge, and concealment." *United States v. Jama*, No. 14-cr-00230 (E.D. Va. Mar. 31, 2017), Sentencing Tr. at 49, ECF No. 332. The judge concluded

that the nature and extent of their conduct transcended the relatively small amount of money that was known to have been sent in support of al-Shabaab. Ms. Jama was sentenced to 144 months' imprisonment with 10 years of supervised release, and Ms. Dhirane was sentenced to 132 months' imprisonment with 10 years of supervised release.

### Amina Esse

Amina Esse was involved in the same "Group of Fifteen" conspiracy to send funds in support of al-Shabaab. She pleaded guilty, in *United States v. Esse*, No. 0:14-cr-00369-MJD (D. Minn. 2014), to one count of conspiracy to provide material support to a foreign terrorist organization. She faced up to 15 years, but prosecutors sought probation because she provided substantial assistance to the government, including providing testimony against co-conspirators. Ms. Esse was sentenced to five years' probation.

### Amina Farah Ali and Hawo Mohamed Hassan

Similar to the defendants in *United States v. Esse* and *United States v. Jama*, Amina Farah Ali and Hawo Mohamed Hassan solicited funds door-to-door in Somali neighborhoods in the U.S. and Canada in order to provide financial assistance to al-Shabaab. In addition, the defendants participated in teleconferences encouraging listeners to make donations in support of al-Shabaab. Ms. Ali communicated directly with Somalia-based members of al-Shabaab who requested financial assistance, yet she often claimed the money she solicited was to help the poor. In *United States v. Ali*, No. 0:10-cr-00187 (D. Minn. 2010), a jury found Ms. Ali and Ms. Hassan guilty of one count of conspiracy to provide material support to the designated foreign terrorist organization al-Shabaab, Ms. Ali guilty of twelve counts of providing material support, and Ms. Hassan guilty of two counts of making false statements to authorities. Ms. Ali was sentenced to 240 months' imprisonment, while Ms. Hassan was sentenced to 120. Both have lifetime terms of supervised release.

### Nima Ali Yusuf

**\*19** In *United States v. Yusuf*, No. 3:10-cr-04551 (S.D. Cal. 2010), Nina Ali Yusuf pleaded guilty to one count of conspiracy to provide material support to a foreign terrorist organization. She admitted to sending approximately $1,450 to men who were fighting in Somalia for al-Shabaab. She also tried to help a co-

conspirator recruit a local man to go and fight for the organization. Ms. Yusuf was sentenced to 96 months' imprisonment with three years of supervised release.

*Mohamud Abdi Yusuf*

Mohamud Abdi Yusuf also solicited and coordinated the transfer of funds to al-Shabaab, sending the terrorist organization money on several occasions. In one instance, he sent approximately $5,000 to al-Shabaab through a co-conspirator, funds which al-Shabaab used to obtain a vehicle for tactical operations and weapons transport. Mr. Yusuf pleaded guilty, in *United States v. Yusuf*, No. 4:10-cr-00547 (E.D. Mo. 2010), to one count of conspiracy to provide material support to a designated terrorist organization and three counts of providing material support to a designated terrorist organization. Mr. Yusuf was sentenced to 140 months' imprisonment with two years of supervised release.

*Hor and Amera Akl*

Hor and Amera Akl planned to conceal and provide up to $500,000 to Hizballah on behalf of anonymous donors in the United States. They met several times with an individual who, unbeknownst to them, was a confidential source working for the FBI, and they eventually agreed to send money to Hizballah leaders by secreting it inside a vehicle they intended to send to Lebanon via a container ship. The confidential source delivered $200,000 to the Akls at their home and told them he would return later in the day with more money. The Akls took steps to begin concealing the money in auto accessories. Mr. Akl and his wife pleaded guilty, in *United States v. Akl*, No. 3:10-cr-00251 (N.D. Ohio 2010), to conspiracy to provide material support to the designated foreign terrorist organization Hizballah. Mr. Akl also pleaded guilty to additional charges including perjury and bankruptcy fraud. Ms. Akl was sentenced to 40 months' imprisonment with three years of supervised release, and Mr. Akl was sentenced to 75 months' imprisonment with ten years of supervised release.

All of the above defendants share with Mr. Jumaev that their convictions involve the provision of money as the form of material support. Yet Mr. Jumaev's conduct does not reach the level of any of theirs:

• He did not attempt to purchase any weapons;

• He had no direct contact with any members of a terrorist organization;

• He did not associate with terrorists or try to support them while in the U.S. Armed Forces or law enforcement;

• He did not take pictures of U.S. monuments to encourage a terrorist attack;

• He did not buy a ticket to travel anywhere;

• He did not serve in a leadership role of an organization;

• He did not solicit funds from other individuals or attempt to recruit them;

• He did not provide thousands or hundreds of thousands of dollars in support;

• He did not provide support on multiple occasions;

• His funds did not result in the purchase of tactical equipment; and

• His efforts were not organized or methodical.

The defendants in the next set of cases exhibited less aggravating conduct than the defendants discussed above, but still more extensive than Mr. Jumaev's in this case. [36] They all received sentences of less than what Mr. Jumaev has already served.

*Oytun Asyse Mihalik*

**\*20** Oytun Asyse Mihalik sent a total of more than $2,000 to a person in Pakistan who she believed was a member of the Taliban and al-Qaeda fighting against the U.S. military. She pleaded guilty, in *United States v. Mihalik*, No. 2:11-cr-00833 (C.D. Cal. 2011), to one count of providing material support to terrorists. She was sentenced to 60 months' imprisonment and agreed that upon the completion of her sentence she would be removed to Turkey.

*Jasminka Ramic*

Ms. Ramic was one of six U.S. citizens from Bosnia charged, in *United States v. Hodzic*, No. 4:15-CR-00049 (E.D. Mo. 2015), with conspiring to provide money,

equipment, and other supplies to jihadists in Syria. She made three payments totaling $700 to a co-conspirator with the intent that the funds be transferred to, and used in support of, a fellow Bosnian-American who was fighting in Syria. While Ms. Ramic was initially motivated to send money and items such as hot chocolate mix to help the children impacted by the conflict in Syria, she eventually became aware that the individual in Syria was fighting with terrorist groups including ISIS. She pleaded guilty to conspiracy to kill or maim persons in a foreign country, which carried a maximum sentence of 60 months. She was sentenced well below the Guidelines range to 36 months' imprisonment.

*Ahmed Nasir Taalil Mohamud*

Ahmed Nasir Taalil Mohamud (Mr. Nasir), the co-defendant of Mr. Moalin (above), was convicted by a jury of only the three conspiracy counts, in *United States v. Moalin*, No. 3:10-cr-04246 (S.D. Cal. 2010), and in contrast with Mr. Moalin, was sentenced to just 72 months' imprisonment with three years of supervised release. The sentencing judge found Mr. Nasir's limited participation to be an important mitigating factor, noting that he was involved with collecting and depositing approximately $1,000 into an account but had no direct contact with the other defendants aside from telephone conversations with Mr. Moalin. The judge further noted that Mr. Nasir generally led a law-abiding and productive life and worked to send money home to his family.

After reviewing all of the related cases, I again sympathize with Judge Hall's remarks: "[N]o matter how I looked at the cases, there's absolutely no way to rationalize the sentencings that have been imposed around the country, on persons who have given material support or committed acts of terrorism." *Ahmad*, No. 3:04-cr-00301-JCH, Sentencing Tr. at 58:9-13. The take-away message in this case, though, is that it is clear that Mr. Jumaev's conduct is the least of the least. A sentence of 15 years, as recommended by the government, would be disproportionate and would contribute to unwarranted sentencing disparities.

IV.

THE SENTENCE TO BE IMPOSED

"It is our duty to see that the force of the state, when it is brought to bear through the sentences of our courts, is exerted with the maximum we can muster of rational thought, humanity, and compassion." Marvin E. Frankel, *Criminal Sentences: Law Without Order* 124 (1973). [37] Despite the nature of this case or perhaps even because of it, I have endeavored with every ounce of my being to craft a sentence for Mr. Jumaev that is based on rational thought, humanity, and compassion.

**\*21** After profound reflection on all of the factors discussed above, I sentence Defendant Bakhtiyor Jumaev to time served, or in effect, 76 months and three days. Mr. Jumaev shall be placed on supervised release for a term of 10 years for each count, to run concurrently. Mr. Jumaev shall immediately pay a special assessment of $200. I find he does not have the ability, prospects, or resources to pay a fine, so I waive the fine in this case.

Within 72 hours of release from the custody of the Bureau of Prisons, Mr. Jumaev shall report to the Probation Office in the District of Colorado. While on supervision, he is subject to the following conditions that may not be changed or modified without prior authorization of this Court.

1. Mr. Jumaev must not commit any other federal, state, or local crime.

2. Mr. Jumaev must not unlawfully possess a controlled substance and must refrain from any unlawful use of a controlled substance. [38]

3. Mr. Jumaev must cooperate in the collection of DNA as directed by the probation officer.

4. After initially reporting to the probation office, Mr. Jumaev will receive instructions from the Court or the probation officer about how and when he must report to the probation officer, and he must report as instructed.

5. Mr. Jumaev must not knowingly leave the federal judicial district where he is authorized to reside without first getting permission from the Court or the probation officer.

6. Mr. Jumaev must answer truthfully the questions asked by his probation officer.

7. Mr. Jumaev must live at a place approved by the probation officer. If he plans to change where he lives

or anything about his living arrangements (such as the people he lives with), he must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, he must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. Mr. Jumaev must allow the probation officer to visit him at any time at his home or elsewhere and must permit the probation officer to take any items that he or she observes in plain view that are prohibited by the conditions of Mr. Jumaev's supervision.

9. Mr. Jumaev must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses him from doing so. If he does not have full-time employment, he must try to find full-time employment, unless the probation officer excuses him from doing so. If he plans to change where he works or anything about his work (such as his position or job responsibilities), he must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, he must notify the probation officer within 72 hours of becoming aware of a change or expected change.

10. Mr. Jumaev must not communicate or interact with someone he knows is engaged in criminal activity. If he knows someone has been convicted of a felony, he must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

11. If Mr. Jumaev is arrested or questioned by a law enforcement officer, he must notify the probation officer within 72 hours.

12. Mr. Jumaev must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person).

**\*22** 13. Mr. Jumaev must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the Court.

14. If the probation officer determines that Mr. Jumaev poses a risk to another person (including an organization), the probation officer may require him to notify the person about the risk and he must comply with that instruction. The probation officer may contact the person and confirm that he has notified the person about the risk.

15. Mr. Jumaev must follow the instructions of the probation officer related to the conditions of supervision.

I find that the Special Conditions of Supervision listed below are reasonably related to the factors enumerated in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3583(d) and do not constitute a greater deprivation of liberty than reasonably necessary to accomplish the goals of sentencing. Thus, Mr. Jumaev is subject to them as well while on supervision.

1. If Mr. Jumaev is deported, he must not thereafter re-enter the United States illegally. If he reenters the United States legally, he must report to the nearest U.S. Probation Office within 72 hours of his return.

2. Mr. Jumaev must allow the probation officer to install software/hardware designed to monitor computer activities on any computer he is authorized by the probation officer to use. The software may record any and all activity on the computer, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software on the computer. Mr. Jumaev must not attempt to remove, tamper with, reverse engineer, or in any way circumvent the software/hardware.

3. Mr. Jumaev must submit his person, property, house, residence, office, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1) ), or other electronic communications, data storage devices, or media to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. Mr. Jumaev must warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that he has violated a condition of his supervision and that the areas to be searched

contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

4. Mr. Jumaev shall not possess, view, access, or otherwise use material that reflects extremist or terroristic views or is deemed to be similarly inappropriate by the U.S. Probation Office.

## Case Appendix to Memorandum Opinion and Order on Sentencing

| Case Name | Relevant Defendant(s) | District | Case No. | Initial Indictment Date | Sentence | Summary | Foreign Terrorist Organization |
|---|---|---|---|---|---|---|---|
| *U.S. v. Pugh* | Tairod Nathan Webster Pugh | E.D.N.Y. | 1:15-cr-00116 | Mar. 16, 2015 | 420 months' imprisonment + 5 years' supervised release<br>(180 months for conviction under § 2339B) | Defendant was charged with violating § 1512(c)(1) and (2) in addition to one count of § 2339B. The defendant was convicted by a jury of both counts. The defendant traveled to Turkey in an effort to cross into Syria to engage in jihad. | Islamic State of Iraq and the Levant / al-Sham (ISIS) |
| | Nader Elhuzayel | | | | 360 months' imprisonment + lifetime supervised release<br>(180 months for each conviction under § 2339B to be served consecutively) | Defendant was found guilty by a jury of two counts of violating § 2339B and 25 counts of violating § 1344. He attempted to provide personnel in the form of himself. | |
| *U.S. v. Elhuzayel* | Muhanad Elfatih M. A. Badawi | C.D. Cal. | 8:15-cr-00060 | June 03, 2015 | 360 months' imprisonment + lifetime supervised release<br>(180 months for each conviction under § 2339B to be served consecutively) | Defendant was found guilty by a jury of two counts of violating§ 2339B and one count of violating 20 U.S.C. § 1097. The defendant facilitated his co-defendant's travel to join ISI by providing his debit card to purchase a one-way airline ticket. | ISIS |
| *U.S. v. Edmonds* | Hasan R. Edmonds | N.D. Ill. | 1:15-cr-00149 | Apr. 02, 2015 | 360 months' imprisonment + 20 years' supervised release.<br>(180 months for each conviction under § 2339B to be served consecutively) | Defendant pleaded guilty two counts of violating § 2339B. The defendant was a member of Army National Guard. The defendants discussed attacking the military base in Illinois and traveling to Syria. | ISIS |
| | Jonas M. Edmonds | | | | 252 months' imprisonment + 20 years' supervised release<br>(180 month' for conviction under §2339B) | Defendant pleaded guilty to one count of violating § 2339B and one count of making a false statement to law enforcement in violation of 18 U.S.C. § 1001. | |
| *U.S. v. Kareem* | Abdul Malik Abdul Kareem | D. Ariz. | 2:15-cr-00707 | June 10, 2015 | 360 months' imprisonment + lifetime supervised release<br>(240 months for conviction under § 2339B) | Defendant was found guilty by a jury of one count of violating § 2339B and of four additional counts involving firearms and making false statements to the Federal Bureau of Investigation.<br>The defendant engaged in a plot to disrupt an event in Texas. Several individuals were injured and two co-conspirators were killed in the attack. Additionally, they had considered attacking military bases, the Super Bowl, and shopping malls. | ISIS |
| *U.S. v. Kurbanov* | Fazliddin Kurbanov | D. Idaho | 1:13-cr-00120 | May 16, 2013 | 300 months' imprisonment + 3years supervised release<br>(180 months for each conviction under § 2339B to run concurrently) | Defendant was found guilty by a jury of two counts of violating § 2339B and of one count of violating 26 U.S.C. § 5861(d). The defendant attempted to provide financial support and personnel, including himself. | Islamic Movement of Uzbekistan |
| *U.S. v. Shah* | Rafiq Abdus Sabir | S.D.N.Y. | 1:05-cr-00673 | June 27, 2005 | 300 months' imprisonment + 2 years' supervised release | Defendant was convicted by a jury of two counts of violating § 2339B. The defendant attempted to provide expert advice and medical assistance to a foreign terrorist organization. | al Qaeda |
| *U.S. v. Khan* | Hafiz Muhammad Sher Ali Khan | S.D. Fla. | 1:11-cr-20331 | May 12, 2011 | 300 months' imprisonment + 5 years' supervised release<br>(180 months for the first count of violating § 2339A and 120 months for the remaining charges to run concurrently) | Defendant was found guilty of two counts of violating § 2339A and two counts of violating § 2339B. The defendant was found guilty on all charges. The defendant solicited, collected, and transferred money to purchase weapons for the Taliban. | Pakistani Taliban |
| *U.S. v. Elfgeeh* | Mufid Elfgeeh | W.D.N.Y. | 6:14-cr-06147 | Sept. 16, 2014 | 270 months' imprisonment + 27 years, 6 months supervised release<br>(180 months for one count and 90 months for the other to run consecutively) | Defendant was indicted for seven counts and ultimately pleaded guilty to two counts of violating § 2339B. He attempted to provide personnel to ISIS. | ISIS |
| | Amina Farah Ali | | | | 240 months' imprisonment + lifetime supervised release<br>(180 months for one count and 60 months for each remaining count) | Defendant was found guilty of thirteen counts of violating § 2339B. The defendant raised and/or provided at least $2,100 to al-Shabbab. | |
| *U.S. v. Ali* | Hawo Hassan | D. Minn. | 0:10-cr-00187 | 2010 | 120 months' imprisonment + lifetime supervised release<br>(120 months for violating § 2339B) | Defendant was found guilty of three counts of violating § 1001 and one count of violating § 2339B. The defendant assisted in raising the $2,100 by encouraging individuals to pledge allegiance to al-Shabbab. | al-Shabbab |
| *U.S. v. Ferizi* | Ardit Ferizi | E.D. Va. | 1:16-cr-00042 | Feb. 16, 2016 | 240 months' imprisonment + 10 years' supervised release<br>(180 months for violating § 2339B). | Defendant pleaded guilty to one count of violating § 2339B and one count of violating 18 U.S.C. § 1030 in relation to hacking. The defendant was a hacker living in Malaysia who obtained U.S. government and military personnel information and provided the information to ISIS. | ISIS |
| *U.S. v. Moalin* | Basaaly Saeed Moalin | S.D. Cal. | 3:10-cr-04246 | Oct. 22, 2010 | 216 months' imprisonment + 3 years' supervised release | Defendant was found guilty of two counts of violating § 2339A, two counts of violating § 2339B, and one count of conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(2). The defendant coordinated with leaders of al-Shabaab. | al-Shabaab |
| *U.S. v. Solano* | Vicente Adolfo Solano | S.D. Fla. | 1:17-cr-20781 | Nov. 02, 2017 | 210 months' imprisonment + lifetime supervised release | Defendant was charged initially with violating § 2339A and later charged with also violating § 2339B. The defendant pleaded guilty to the count of violating § 2339B. The defendant attempted to use a weapon of mass destruction to destroy a mall on and wanted to join ISIS. | ISIS |
| | Ehsanul Islam Sadequee | | | | 204 months' imprisonment + 30 years' supervised release<br>(180 months for each of three counts to run concurrently plus 24 months for conspiracy to provide material support to a foreign terrorist organization to run consecutively) | Defendant was found guilty of two counts of violating § 2339A and two counts of violating § 2339B. The defendants conducted surveillance and met with others to discuss possible targets for a terrorist attack. | |
| *U.S. v. Ahmed* | Syed Haris Ahmed | N.D. Ga. | 1:06-cr-00147 | Mar. 23, 2006 | 156 months' imprisonment + 30 years' supervised release | Defendant was found guilty of one count of violating §2339A. | Lashkar-e-Taiba (LET) |
| *U.S. v. Young* | Nicholas Young | E.D. Va. | 1:16-cr-00265 | Dec. 15, 2016 | 180 months' imprisonment (for each count to run concurrently) + 15 years' supervised release | Defendant was found guilty of two counts of attempting to obstruct justice in violation of 18 U.S.C. § 1512(c)(2) and of one count of violating § 2339B. The defendant was a police officer and on several occasions purchased gift cards to be used by ISIS for recruitment. | ISIS |
| *U.S. v. Holy Land Foundation for Relief and Development* | Mohammed El-Mezain | N.D. Tex. | 3:04-cr-00240 | July 26, 2004 | 180 months' imprisonment + 3 years' supervised release | Defendant was charged with twelve counts of violating § 2339B, ten counts of violating 50 U.S.C. §§ 1701-1706, and one count of violating 12 U.S.C.§ 1956. The defendant was convicted by the jury of one count of violating § 2339B. The defendant was a large scale financier for Hamas. Together with his co-conspirators, they raised over $12,000,000. | Hamas |
| *U.S. v. Kauser Mohammed* | Gufran Ahmed Kauser Mohammed | S.D. Fla. | 1:13-cr-20364 | May 21, 2013 | 180 months' imprisonment + 5 years' supervised release | Defendant pleaded guilty to one count of violating § 2339B. He attempted to provide personnel and funds totaling approximately $26,000. | al Qaeda & al-Shabaab |
| *U.S. v. Nayyar* | Patrick Nayyar | S.D.N.Y. | 1:09-cr-01037 | Oct. 26, 2009 | 180 months' imprisonment; no supervised release because subject to deportation<br>(60 months for each violation of § 3229B to run concurrently with each other but consecutive to other counts) | Defendant was found guilty of two counts of violating § 2339B, two counts of violating 50 U.S.C. § 1705(a), and one count of violating 18 U.S.C. § 371. The defendant agreed to provide goods in the form of guns, ammunition, vehicles, bulletproof vests, and night vision goggles because he thought they would be used to support Hizballah. | Hizballah |
| *U.S. v. Chandia* | Ali Asad Chandia | E.D. Va. | 1:05-cr-00401 | Sept. 14, 2005 | 180 months' imprisonment + 3 years' supervised release<br>(180 months for each count of violating § 2339B to be served concurrently) | Defendant was found guilty of one count of violating § 2339A and two counts of violating § 2339B. The defendant provided paint balls for training activities in the Lashkar-e-Taiba. | Lashkar-e-Taiba (LET) |
| *U.S. v. Morgan* | Donald Ray Morgan | M.D.N.C. | 1:14-cr-00414 | Waived indictment Oct. 30, 2014 | 180 months' imprisonment + 3 years' supervised release<br>(180 months for violating § 2339B; received an additional 63 months for separate charge of felon in possession of a firearm) | Defendant pleaded guilty to one count of violating § 2339B. The defendant purchased a ticket to enter Syria and participate in jihad. | al Qaeda/ISIS |
| *U.S. v. Davis* | Leon Nathan Davis | S.D. Ga. | 1:15-cr-00059 | Waived indictment May 27, 2015 | 180 months' imprisonment + lifetime supervised release | Defendant pleaded guilty to one count of violating § 2339B. The defendant attempted to fly to Turkey and later Syria to join ISIS. | ISIS |
| *U.S. v. Saadeh* | Alaa Saadeh | D.N.J. | 2:15-cr-00558 | Waived indictment Oct. 29, 2015 | 180 months' imprisonment + lifetime supervised release | Defendant pleaded guilty to one count of violating § 2339B. The defendant was planning on going to Turkey to support ISIS. | ISIS |
| *U.S. v. Dandach* | Adam Dandach | C.D. Cal. | 8:14-cr-00109 | July 16, 2014 | 180 months' imprisonment + lifetime supervised release | Defendant pleaded guilty to one count of violating § 1542 and one count of violating § 2339B. The defendant attempted to board a flight to Turkey and also received a conviction for a false passport. | al Qaeda/ISIS |
| *U.S. v. Cordoba-Bermudez* | Juanito Cordoba-Bermeduez | S.D.N.Y. | 1:08-cr-01290 | Feb. 05, 2009 | 180 months' imprisonment + 3 years' supervised release | Defendant pleaded guilty to one count of violating § 2339B. The defendant was involved in multiple conversations with co-conspirators about logistics for seizing weapons from Panamanian authorities. | Revolutionary Armed Forces of Colombia (FARC) |
| *U.S. v. Kashmiri* | Tahawwur Hussain Rana | N.D. Ill. | 1:09-cr-00830 | Dec. 07, 2009 | 168 months' imprisonment + 3 years' supervised release | Defendant was found guilty of one count of violating § 2339A and of one count of violating § 2339B. The defendant allowed his co-conspirators to use his business as a cover to conceal travel and surveillance for terrorist attacks. | Lashkar-e-Taiba (LET) |
| | Narseal Batiste | | | | 162 months' imprisonment + 35 years' supervised release | Defendant was found guilty of one count each of violating § 2339A, § 2339B, § 844, and § 2384.<br>The defendants swore allegiance to al Qaeda, purchased a camera, and scouted locations for what they believed would be a domestic attack. | |
| | Patrick Abraham | | | | 112.5 months' imprisonment + 15 years' supervised release | Defendant was found guilty of one count each of violating § 2339A, § 2339B, and § 844. | |
| | Stanley Grant Phanor | | | | 96 months' imprisonment + 15 years' supervised release | Defendant was found guilty of violating one count of § 2339A and one count of §2339B. | |
| | Rotschild Augustine | | | | 84 months' imprisonment + 10 years' supervised release | Defendant was found guilty of violating one count of § 2339A and one count of §2339B. | |
| *U.S. v. Batiste* | Burson Augustin | S.D. Fla. | 1:06-cr-20373 | June 22, 2006 | 72 months' imprisonment + 10 years' supervised release | Defendant was found guilty of violating one count of § 2339A and one count of §2339B. | al Qaeda |
| *U.S. v. Velasco* | Mauricio Santoyo Velasco | E.D. Va. | 1:12-cr-00217 | May 24, 2012 | 156 months' imprisonment + 5 years' supervised release | Defendant pleaded guilty to one count of violating § 2339B. The defendant accepted bribes in exchange for the information and assistance he could provide as a high-level law enforcement officer in Colombia. The information allowed AUC members to avoid detection and arrest. | United Self-Defense Forces of Colombia (AUC) |
| *U.S. v. Jama* | Muna Osman Jama | E.D. Va. | 1:14-cr-00230 | June 24, 2014 | 144 months' imprisonment (on each count) + 10 years' supervised release | Defendant was found guilty of 21 counts of violating § 2339B. The defendant provided several payments to al-Shabaab including one payment of $1,500. | al-Shabaab |

**All Citations**

Slip Copy, 2018 WL 3490886

Footnotes

1     The conversation went as follows:

        BJ: ... has the wedding gift arrived? The wedding gift?

        JM: No, it hasn't yet.

        BJ: It still hasn't made it there?

        JM: ... No.

        BJ: Glory be to Allah! But I've sent it out last week!

        JM: We haven't checked the mail yet. We'll check the mail. [To someone in the back] Have you, by any chance, checked the mail recently? A check should be coming-

        BJ: ... God willing, it will. Hmm...

        JM: It hasn't come yet. It will, God willing...

    Gov't Trial Ex. 128A at 1.

2     Apart from these rulings on the applicable Sentencing Guidelines provisions, no finding is necessary concerning Mr. Jumaev's remaining objections or clarifications to the Presentence Investigation Report because the controverted matters have either been addressed through revisions to the Report or will not be taken into account in imposing the sentence. The factual statements in the Report are otherwise adopted.

3    "All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: ... (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2.

4    "U.S.S.G. [§] 3A1.4 is draconian." James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 54 (2010).

5    Persisting with its trying habits, the government fails to tailor its filing and argument to Mr. Jumaev.

6    There is an argument that Mr. Jumaev's offenses intended to promote Mr. Muhtorov's commission of federal crimes of terrorism. It is not advanced by the government and I decline to make it on its behalf.

7    This finding is inconsequential because, as I explain below, I would depart under U.S.S.G. §§ 4A1.3 and 5K2.20 to reduce the impact of the Terrorism Enhancement and would still grant a variance resulting in the same sentence.

8    The government recounts that Mr. Jumaev testified that he did not "know" Mr. Muhtorov intended to travel in order to join the IJU. A more accurate summary of his testimony is that he did not believe Mr. Muhtorov was traveling for that purpose because he thought he was just bragging. *See, e.g.,* Trial Tr. at 1357:2-16, ECF No. 1843.

9    Though not directly relevant to this case, the trial tax or trial penalty as expressed and encouraged in the Sentencing Guidelines is yet another reason to reject them.

10   Again, if the Terrorism Enhancement were applicable to Mr. Jumaev's offenses, I would reduce his offense level to an even greater extent under § 5K2.20.

11   As I discuss later, however, no established programs exist in our criminal justice system or in the Bureau of Prisons to rehabilitate individuals charged and/or convicted of crimes related to terrorism.

12   It seems I am not alone in my conclusion. Sentencing Commission statistics inform that, of 16 defendants from 2013 to 2017 for which § 2339B is the only count of conviction, 62.5% or 10 defendants received sentences that were below the Guidelines range that were not sponsored by the government. Presentence Report Ex. B at 2, ECF No. 1915-2. The average reduction for nongovernment sponsored below-range sentences was 41.1% or 79 months. *Id.*

13   This analysis may be as relevant or more so in sentencing Mr. Muhtorov, but I provide it here to illustrate the illogical and confounding approach of the Guidelines for sentencing individuals convicted of crimes related to terrorism.

14   For descriptions of the evolution of the Guideline, see McLoughlin, *supra*, at 59-62; Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1527-28 (2017).

15   *See United States v. Salim*, 690 F.3d 115, 126 (2d 2012) (holding that a district court is not required to reject the Terrorism Enhancement because it was not the product of empirical research but "may give a non-Guidelines sentence where she disagrees with the weight the Guidelines assign to a factor").

16   *See* McLoughlin, *supra*, at 112 ("[W]hen U.S.S.G. [§] 3A1.4 was adopted, the number of the anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline.") (footnote omitted); *accord* Symposium, *Convicted Terrorists: Sentencing Considerations and Their Policy Implications*, 8 J. Nat'l Security L. & Pol'y 347, 361 (2016) (Judge Gerald Lee confirming: "The [G]uidelines are not based on any empirical research. There has been no study to determine how much time a terrorist should have or how much time a drug offender should have; everyone should know that. There is a book that has mathematics in it, but is not based on anything other than what is in the book, and it is math. That is all it is.").

17   This effect was artfully described by the Probation Officer in this case: "What is clear from [my] research is despite a significant range of conduct that can produce a conviction for material support, the sentencing guidelines result in a nearly identical guideline range in each case, regardless of the underlying conduct. Material support can involve financial support, as it did in the defendant's case, or traveling with the purpose of fighting jihad personally, as it did with his codefendant. Other examples include securing and providing weapons for terrorist organizations, providing the location of military and government employees to terrorist organizations through hacking activities, and plots to attack military bases in the United States and around the world. The difficulty is that under the guidelines, there is no distinction between less and more serious offenses, those in which actual harm occurred and those where it did not." Presentence Report Ex. A at 4, ECF No. 1915-1; *accord* McLoughlin, *supra*, at 54 ("[T]he Guideline automatically and uniformly increases a defendant's offense level, ensuring a defendant will be sentenced as if his or her offenses are among the most serious offenses addressed by the Sentencing Guidelines regardless of where the offense level fits on the spectrum of 'material support.' ") (footnotes omitted).

18   As Judge O'Toole opined:

     I do not think the Guidelines applied in accordance with their terms do an adequately reliable job in balancing the relevant sentencing factor[s] for several reasons: First, the terrorism adjustments that we referred to when we set the

Guidelines range operate in a way that is too general to be convincingly reliable in a given case. Both the 12-level adjustment to the offense level and the automatic assignment of a Criminal History Category VI which are applied in any case that can be fairly characterized as a terrorism case, regardless of the particular facts, not only make the recommendation unuseful as a guide in a particular case but it is actually, in my view, contrary to and subversive of the mission of the Guidelines which is to address with some particularity the unique facts of the given case. And gross adjustments such as the ones I've referenced do not do that.

*Mehanna*, No. 1:09-cr-10017-GAO, Sentencing Tr. at 68:23-69:13.

19   Moreover, as James McLoughlin explains in his comprehensive article on the Terrorism Enhancement, there is an argument that Congress has endorsed the substantial increase in the length of prison sentences for crimes related to international terrorism resulting from the Terrorism Enhancement. McLoughlin, *supra*, at 60. But later enacted statutes "have sentences far shorter than those mandated by U.S.S.G. [§] 3A1.4, and as such they are inconsistent with the view that Congress intended sentences under [that section] to be as severe as they are." *Id.* at 60-61 (footnotes omitted). Consequently, it does not seem that the Terrorism Enhancement is entitled to more deference, as some have argued. *See* Brown, *supra*, at 520 (maintaining that the enhancement is entitled to more deference because it originated with Congress and not the Sentencing Commission).

20   *See United States v. Ressam*, 679 F.3d 1069, 1106 (9th Cir. 2012) (Schroeder, J., dissenting) ("The majority's implicit assumption that terrorism is different, and must be treated differently ... flies in the face of the congressionally sanctioned structure of sentencing that applies to terrorism as well as all other kinds of federal criminal offenses. Our courts are well equipped to treat each offense and offender individually, and we should not create special sentencing rules and procedures for terrorists. In presiding over the many terrorism-related cases on their dockets, courts have treated other issues in terrorism cases in ways that do not differ appreciably from more broadly applicable doctrines.").

21   Karen Greenberg, Director of the Center on National Security at Fordham Law, agrees:

There needs to be some kind of formal understanding of who gets sentenced for what, and with some gradations and constancy when it comes to terrorism trials-where it doesn't all go to the far end of the sentencing spectrum because they are labeled terrorists .... We should consider that there are different levels of involvement in terrorism. The material support statute, a broad category that has made it easier to figure out how to use the criminal justice system to prosecute terrorists, has contributed to this problem. The breadth of the material support statute reduces the need to make the kinds of careful distinctions and comparisons that would otherwise be made in criminal sentencing contexts.

Symposium, *supra*, at 368-69.

22   I am additionally mindful of the fears that the current practice for sentencing individuals convicted of crimes of terrorism, including application of the Terrorism Enhancement, has unintended national security consequences. *See* Christina Parajon Skinner, *Punishing Crimes of Terror in Article III Courts*, 31 Yale L. & Pol'y Rev. 309, 381 (2013) (arguing that the current sentencing system has created a serious national security weakness–"the risk that it is 'hardening' terrorist defendants against America, and contributing to the development or entrenchment of terrorist networks."); McLoughlin, *supra*, at 76 ("One must ask what U.S.S.G. [§] 3A1.4 adds to the equation that improves sentencing or anti-terrorism policy when it creates such draconian anomalies that (in the case of defendants who are foreign nationals) become newsworthy in the countries from which the defendants have come fostering a belief that the U.S. justice system is biased and fundamentally unfair.").

23   *See, e.g.,* Mar. 19, 2018 Report at 5-9. *available at* https://oig.justice.gov/reports/2018/1803.pdf (documenting tens of civil rights and civil liberties complaints by Muslim inmates). Mr. Jumaev's disciplinary history even includes one instance in which he did not receive his food following a Ramadan fast and became angry. Presentence Report at 4.

24   *See* Human Rights Watch and Columbia Law Sch. Human Rights Inst., *Illusion of Justice: Human Rights Abuses in U.S. Terrorism Prosecutions* 131-51 (2014), *available at* https://www.hrw.org/report/2014/07/21/illusion-justice/human-rights-abuses-us-terrorism-prosecutions.

25   *See* Joshua L. Dratel, *The Literal Third Way in Approaching "Material Support for Terrorism": Whatever Happened to 18 U.S.C. § 2339B(c) and the Civil Injunctive Option?*, 57 Wayne L. Rev. 11, (2011) (discussing the theory of Italian philosopher and criminologist Cesare Beccaria that "the lack of any distinction between punishments for crimes of unequal kind or degree creates a dangerous and counterproductive equation: an offender contemplating two offenses, a greater and a lesser, that are punished alike is presented no disincentive to forego the greater for the lesser. If the punishments are identical, there is no greater risk in attempting the greater.").

26   *See, e.g.,* Ahmed, *supra*, at 1566 ("[N]ot only do lengthy sentences hinder rehabilitation, but they can also promote recidivism, especially in the terrorism context."); Parajon Skinner, *supra*, at 381 ("The risk that terrorists will harden in

the U.S. prison system, or, in ordinary criminal language 'recidivate,' is at least in part a function of their experience in prison, inclusive of their perceptions of the process behind the punishment.").

27    "Inmates can be radicalized in many ways, including through the delivery of anti-U.S. sermons, exposure to other radical inmates, or the distribution of extremist literature .... While radicalization does not necessarily lead inmates to join terrorist organizations, it can, upon their release, lead them to attend and serve in radical mosques or obtain religious education overseas in locations that provide further opportunities for radicalization and terrorist recruitment." Office of the Inspector Gen., U.S. Dep't of Justice, *A Review of the Federal Bureau of Prisons' Selection of Muslim Religious Services Providers* 6-7 (2004), *available at* https://oig.justice.gov/special/0404/final.pdf.

28    *Accord* Office of the Inspector Gen., *supra*, at 6-7, ("This freeze on hiring Muslim chaplains implicates prison security and presents counterterrorism concerns. Without a sufficient number of Muslim chaplains on staff, inmates are, according to the Chief of the Chaplaincy Services Branch and the ten BOP Muslim chaplains, much more likely to lead their own religious services, distort Islam, advocate Prison Islam, and espouse extremist beliefs.").

29    *Ahmad*, No. 3:04-cr-00301-JCH, Sentencing Tr. at 32:8-11, ECF No. 220 ("I don't think it's right to act on what I would call an unfounded fear that a defendant might do something, like a terrorist act, and therefore we should just lock that person up forever .... I think I need to be conscious of assessing the nature and circumstances of what the defendants did and not merely react to that title as ascribed to this case.").

30    *See* Ahmed, *supra*, at 1567 (2017) (explaining that programs focused on rehabilitating individuals convicted of terrorism offenses have not been instituted in American prisons); *United States v. Bell*, 81 F.Supp.3d 1301, 1318 (M.D. Fla. 2015) (citing testimony by a Federal Bureau of Prisons representative that "the BOP currently has no programs for de-radicalizing prisoners convicted of crimes of terrorism").

31    *See* Spearit, *supra*, at 78 ("The best course to successful return to society is educational training on the inside. Although, there is little empirical research on whether education reduces recidivism, education may militate against extremism directly, since groups like al-Qaeda have been known to prey on uneducated individuals to conduct their violent biddings.").

32    *Ahmad*, No. 3:04-cr-00301-JCH (D. Conn. June 16, 2014), Babar Ahmad's Memorandum in Aid of Sentencing Ex. N, ECF No. 179-14.

33    Charles Doyle, Cong. Research Serv., R41333, *Terrorist Material Support: An Overview of 18 U.S.C. § 2339A and § 2339B (2016)*, *available at* https://fas.org/sgp/crs/natsec/R41333.pdf.

34    A comprehensive table of cases in which a defendant was sentenced for charges under 18 U.S.C. § 2339 is attached as an Appendix to this Order.

35    Mr. Jalloh was charged after the maximum term of imprisonment for a conviction under 18 U.S.C. § 2339B was raised from 15 years to 20 years, as were Nicholas Young, Haris Qamar, Hinda Osman Dhirane, and Muna Osman Jama.

36    I acknowledge that the sentences of these defendants was likely impacted by plea bargaining, but I nevertheless find them to be more similarly situated to Mr. Jumaev than those who organized complex funding and recruitment schemes or provided direct support for attacks and violent activities. Furthermore, as I have already explained, I refuse to employ any sort of trial "tax."

37    While the U.S. Sentencing Commission and its Guidelines were envisioned by Judge Frankel, Guidelines such as those applicable for offenses related to terrorism, under which defendants are punished uniformly for dissimilar conduct, exacerbate the infirmities in our justice system that he sought to redress.

38    I waive the mandatory drug testing provision of 18 U.S.C. §§ 3563(a)(5) or 3583(d), because the Presentence Report indicates a low risk of future substance abuse by Mr. Jumaev.

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.